[S. F. No. 4950. In Bank.—November 22, 1909.]

# THOMAS ROSS COOLEY, Appellant, v. MILLER & LUX (a Corporation), et al., Respondents.

Estates of Deceased Persons—Effect of Decree of Distribution on Title.—Under section 1666 of the Code of Civil Procedure, a decree distributing the estate of a deceased person is conclusive as to the rights of heirs, legatees, or devisees, but it is conclusive against them only as heirs, legatees, or devisees, that is, only so far as they claim in such capacities. Its determination of such matters does not create any new title; it merely declares the title which accrued under the law of descents or under the provisions of the will.

Id.—Grant of Devisee Pending Administration—Distribution to Devisee—Right of Grantee not Divested.—Where a devisee, after the death of his testator and prior to the distribution of the estate, makes a valid grant of his interest in the estate, a decree distributing such interest to the devisee, where there was no express issue or contest involving such transfer in the probate court, and the rights of the grantee were never actually considered or passed on by that court, does not have the effect to divest the grantee of his rights in the property acquired under the grant.

Id.—Agreement with Attorney for Interest in Estate Devised—Grant of Present Interest—Security for Services.—Where pending the administration of a testator's estate, non-resident devisees enter into an agreement with an attorney, whereby in consideration of the promise of the attorney to represent them in his professional capacity throughout the administration, they agree to grant him a certain interest in their respective shares, and thereafter, and while the administration is still pending, a second agreement is executed between them, which cancels the first agreement, and on its face expresses an absolute, present grant to the attorney of such interest in their respective shares, for the expressed consideration of services already rendered and to be rendered, such second agreement is to be construed as a present conveyance of the interests, and not as a mere security for the payment of the attorney's services.

Id.—Allowance for Services as Attorney for Absent Heirs—Credit for Under Agreement.—A provision in such conveyance, that any allowance made to the attorney by the court as attorney for absent heirs, should be first applied to reimburse him for all outlays made by him in rendering his services for his clients, and the balance should be credited to them on final settlement, does not have the effect to make such conveyance a mortgage.

ID.—PLEADING—AVERMENT AND DENIAL OF OWNERSHIP—SUFFICIENCY OF FINDING.—In cases where it is sufficient for the plaintiff, suing in regard to property, to allege merely that he is the owner thereof, a denial of this allegation is sufficient to authorize the admission of evidence that the title under which plaintiff claims was absolutely void and not voidable merely, or any evidence to show that plaintiff had no title, and in such cases a finding upon the fact of title or ownership is good without a finding of the particular facts upon which such title or want of title depends.

ID.—CONTRACT BETWEEN ATTORNEY AND CLIENT—CONFIDENTIAL RELATION — PRESUMPTION OF UNDUE INFLUENCE. — The relation of attorney and client is confidential in character, and any contract entered into between them while that relation continues, whereby the attorney obtains an advantage from the client, is presumed to have been made by the client under the undue influence of the attorney. The presumption does not apply to a transaction in which the attorney openly assumes a hostile attitude to his client, nor to a contract by which the relation is originally created and the compensation of the attorney fixed.

ID.—ACTION BY ATTORNEY FOR PARTITION—JUDGMENT FOR DEFENDANT BASED ON ERRONEOUS THEORY.—In an action by the attorney, brought after a decree distributing their entire shares to such devisees, for a partition of the property so distributed, a judgment in favor of the defendants, based on the erroneous theory that the decree of distribution operated to divest the attorney of his interest acquired by the conveyance from the devisees, will not be affirmed under the circumstances of this case, merely because a presumption against the validity of the grant would arise from the relations of the parties shown upon the face of the instrument, where no such presumption was pleaded as a cause for declaring the grant void.

ID.—AGREEMENT TO REPAY ATTORNEY FOR OUTLAYS—PERSONAL AND TRAVELING EXPENSES NOT INCLUDED.—In the absence of a special agreement to the contrary, a client is bound to repay his attorney for all outlays made by him in the payment of the expenses of carrying on the litigation, and the attorney is bound to bear his own personal and traveling expenses. The word ·"outlays" when used in that connection does not ordinarily mean the personal or traveling expenses of the attorney, but refers to costs of suit and other expenses paid to third persons for similar purposes.

APPEAL from an order of the Superior Court of the City and County of San Francisco refusing a new trial. Frank J. Murasky, Judge.

The facts are stated in the opinion of the court.

Sullivan & Sullivan, Theo. J. Roche, and John J. Barrett, for Appellant.

L. M. Hoefler, Loewry & Gutsch, Edward F. Treadwell, and W. B. Treadwell, for Respondents.

SHAW, J.—In the court below, after a trial upon the merits, judgment was given in favor of the defendants. Plaintiff appeals from an order denying his motion for a new trial.

The plaintiff sued to obtain partition of certain lands, alleging that he was the owner of an undivided three hundredths thereof as tenant in common with the defendants, and that the respective interests of the defendants were unknown to him. The defendants divided into groups and filed five separate answers, each denying the interest of plaintiff and stating their respective interests.

The land formerly belonged to Miller & Lux, a partnership of two persons,—namely Henry Miller and Charles Lux. Lux died testate on March 15, 1887. The corporation defendant is the successor in interest of Henry Miller and of a number of the devisees of Lux. The interest which the plaintiff claims in the land was obtained by his grantor, James H. Campbell, after the death of Lux and before distribution of his estate, under an instrument executed on July 14, 1890, by Campbell and certain of the defendants, or their predecessors in interest, who were devisees and legatees of Lux or successors of such devisees and legatees. These defendants will be here designated as the "German heirs." The instrument is called "Exhibit B." It was preceded by another instrument executed by the same parties on January 6, 1888, called "Exhibit A," which was expressly canceled by "Exhibit B." Plaintiff claims that Exhibit B was, in effect, a conveyance to Campbell of an undivided three hundredths of the interests of the German heirs in the estate, real and personal, of Charles Lux. Campbell afterwards conveyed to John H. Campbell, who conveyed to the plaintiff. Under the terms of the will of Lux, the German heirs were given the entire residue of one half of the estate of Charles Lux, after certain bequests were satisfied, all of which have been discharged. A one-half interest in Lux's share of the land in controversy is therefore to be disposed of according to the respective rights and interests of the plaintiff and the German heirs.

Upon the trial the defendants, over plaintiff's objection, introduced in evidence the record of the proceedings in the

superior court in the administration proceedings, distributing the estate of Charles Lux, including the decree of final distribution thereof, entered on July 3, 1890. Neither the petition, nor the decree, mentioned or referred to the conveyance of any interest in the estate to Campbell, nor disclosed any claim by him thereto. He did not appear in the proceeding or in any way assert therein that he had or claimed any such interest. He was not cited or summoned to appear, and only the usual general notice by posting was given of the hearing. The decree purported to distribute to the German heirs by name, to each his respective share, the whole of the interest given to them by the will, entirely ignoring the claim or share transferred to Campbell.

1. It is claimed by the defendants that because the proceedings in distribution of the estate of Charles Lux were initiated after the execution of the alleged grant to Campbell, the decree constitutes a bar to his claim and operated to divest the plaintiff of any interest he may have had as grantee or successor of Campbell.

We think the decree of distribution had no such effect as the defendants claim. The decisions of this court on the question of the effect of a decree of distribution of the estate of a decedent upon transfers by heirs or devisees of their shares or interests in the estate, made by them after the death of the ancestor and prior to such distribution, have not been entirely consistent. It is claimed that there are cases which hold that a decree distributing the share to an heir or devisee bars a grantee of such heir or devisee, although there was no express issue or contest involving such transfer and the rights of grantee were never actually considered or passed on by the court. This the respondents assert to be the correct principle applicable to the present case.

The first case on the subject was *Freeman* v. *Rahm*, 58 Cal. 111. That case decided that a purchaser from an heir of his interest in the estate consisting of land, who has fully paid the purchase money, the sale being in *parol*, but who has not received a deed nor taken possession under his purchase, and who has no evidence of his purchase except a power of attorney from the heir authorizing him to receive distribution of the heir's interest on final settlement of the estate, is absolutely barred by a subsequent decree distributing such interest

CLVI Cal.—33

to the heir, and that a creditor who has attached the interest of the heir, after distribution and before the execution of a deed to the purchaser by the heir, has a lien on the land superior to any right of such purchaser. A parol sale of land, without delivery of possession, although the price is fully paid, is wholly void, gives no right to specific performance and vests no right, title, or interest in the buyer. (*Forrester v. Flores,* 64 Cal. 26, [28 Pac. 107]; *Edwards* v. *Estill,* 48 Cal. 194; *Fulton* v. *Jansen,* 99 Cal. 590, [34 Pac. 331]; *Salfield* v. *Sutter etc. Co.,* 94 Cal. 549, [29 Pac. 1105].) The power of attorney did not purport to be and was not a transfer of any interest. The opinion correctly states the law when it declares that the purchaser should have appeared and claimed distribution upon final settlement, and that having failed to do so he was bound by the decree. He had no valid, legal or equitable claim to or transfer of the land, and his only right, if he had any right at all, was that given by the power of attorney,—namely, the right to receive the share of the heir on distribution. There are some statements in the opinion to the effect that he would have been barred even if he had received a valid transfer from the heirs, but they are mere *dicta* and have been ever since so regarded.

Justice Harrison, in *Martinovich* v. *Marsicano,* 137 Cal. 359, [70 Pac. 459], remarked that Justice Myrick's opinion in *Freeman* v. *Rahm* was not authority because it was concurred in by only two other justices. From the fact that four judges participated in the decision he evidently supposed it was a decision by the court in Bank. Investigation shows that the case was heard and decided in Department Two at the May session of 1881, that Chief Justice Morrison sat with Department Two at that session, and that he participated with the other justices in many of its decisions so that four justices appear to have rendered the same. The case was assigned to Department Two, it was never transferred to the court in Bank and it is really a Department decision, and properly made by three justices. The reasoning of Justice Myrick on the point now involved was disapproved by the court in Bank in *Martinovich* v. *Marsicano* and also in *Chever* v. *Ching Hong Poy,* 82 Cal. 68, [22 Pac. 1081], and it cannot now be regarded as authority.

In *Bath* v. *Valdez*, 70 Cal. 360, [11 Pac. 727], the court held that a decree of distribution, made in the usual way, does not in any manner affect the title of one who has held by adverse possession against the heirs a sufficient time to gain title by prescription. The court says: "It is *the estate* of the deceased upon which the probate court administers. It is the title which the deceased had in and to the real property at the time of his death, or which has inured to the estate after death and before distribution, which passes to the heirs and devisees." This language was quoted and approved in *Barnard* v. *Wilson,* 74 Cal. 517, [16 Pac. 307], but as the right there in issue was an adverse claim against the ancestor, the latter case is not strictly applicable here.

The case of *Chever* v. *Ching Hong Poy,* 82 Cal. 68, [22 Pac. 1081], is precisely in point. A son conveyed to his mother his interest in remainder, as devisee, in the estate of his deceased father, the mother being the devisee of a life estate therein. Afterwards distribution was had of the father's estate. The mother was given the life estate, and the share in the remainder, which had been conveyed to the mother by the son, was distributed to the son, disregarding the conveyance. This decree became final and the case before this court involved a collateral inquiry as to the effect and binding force of the decree of distribution. The contention was that "the subsequent decree of distribution entirely destroyed the effect of that deed and conclusively established the title in" the son, as of the date of the decree. The court held the contrary, saying that under section 1666 of the Code of Civil Procedure a decree of distribution "is conclusive as to the rights of heirs, legatees, or devisees, "but it is conclusive against them only *as* heirs, legatees, or devisees,—only so far as they claim in such capacities. . . . Its determination of such matters does not create any new title; it merely declares the title which accrued under the law of descents or under the provisions of the will. . . . An heir may contract about or convey the title which the law had cast upon him by the death of his ancestor; and the validity or force of such contract is not affected by the fact that a probate court afterwards, by its decree of distribution, declares his asserted heirship and title to be valid." The opinion expressly discredits *Freeman* v. *Rahm* and practically overrules it so far as it

declares a contrary doctrine. It should be here remarked that
in approving the decision in the Chever case as we do, it is
not necessary to approve the intimation in the opinion that
section 1678 of the Code of Civil Procedure applies only
where partition of the lands is made under sections 1675
et seq., and not where a mere distribution is made under sec-
tion 1665 of the same chapter. Section 1678 in terms author-
izes distribution to a grantee, as well as partition. In the
subsequent case of the *Estate of Vaughn,* 92 Cal. 192, [28
Pac. 221], written by the same justice, this intimation was
stated to be *dictum.* In the latter case the heirs had granted
all their interest in the entire estate to Martha A. Bradford.
The petition for distribution alleged these grants and prayed
for distribution of the entire estate to the grantee. No objec-
tion or opposition thereto was made in the lower court, but
it nevertheless distributed the estate to the heirs, believing
that the decision in *Chever* v. *Ching Hong Poy* required that
course. The supreme court held that this was error and re-
versed the decree, saying: "In the Chever case, the appellant,
William J. Chever, had, pending the administration of the
estate of his deceased father, conveyed to his mother all his
interest in the real property of said estate. Upon final dis-
tribution, the claim of the mother as grantee of William J.,
for some reason was not set up, and was not before the court;
and the court very properly, upon the facts before it, distrib-
uted the interest in question to the heir William J., who was
still apparently the owner of it. He afterwards claimed that
the decree of distribution conclusively estopped the mother
from setting up title under the prior conveyance; but this
court held that such was not the law, and that was the only
point *decided* in the case." In *Estate of Burton,* 93 Cal. 461,
[29 Pac. 36], the court, referring to the Chever case in argu-
ment, says: "In the ordinary mode of distribution the grantee
of the heir is not a party to the proceeding and there is no
issue as to his title presented for determination. This being
so, of course the court would have no jurisdiction to try or
determine anything as to the title of the grantee." In *Estate
of Burdick,* 112 Cal. 292, [44 Pac. 735], the court again in the
course of its argument says: "The probate court, in the mat-
ter of the administration of estates, has jurisdiction of the
estates of dead men and can distribute only to heirs, devisees,

or legatees, or to those claiming through them, and the decree of distribution is conclusive as to the succession or testamentary rights." In *Estate of Crooks*, 125 Cal. 461, [58 Pac. 89], it is again declared that "the decree of distribution is only conclusive upon the matter of succession, or as to the rights under a will—at least, where the estate is distributed without an actual contest to the heirs, devisees, and legatees. The title dates back to the death of the testator, or of their ancestor, and a distribution directly to them does not affect rights acquired from them since it accrued." In this case the court held that distribution should not be made to a mortgagee of an heir.

These indorsements and approvals of the doctrine declared in *Chever* v. *Ching Hong Poy* would appear to be sufficient to settle the question as to the paramount authority of that case over *Freeman* v. *Rahm*, with which it is in apparent conflict and which it expressly refused to follow. It is claimed, however, that the doctrine of *Freeman* v. *Rahm* was again adopted by the court in the case of *William Hill Co.* v. *Lawler*, 116 Cal. 359, [48 Pac. 323]. It is this case upon which the respondent chiefly relies and upon the authority of which it is said the court below based its ruling.

The case expressly recognizes the soundness of the decision in the Chever case, but there are some expressions in the opinion which, taken alone and without the proper consideration of the facts to which they relate, appear to be in conflict with the doctrine of the Chever case. There is, however, a difference between the facts of the two cases which clearly distinguishes the latter from the former. In the Chever estate the son had conveyed to his mother, the interest so conveyed was distributed to the son, and the subsequent controversy arose directly between them over the title to the identical property. In the Lawler estate the mother had conveyed to one son, John, her undivided one-half interest in a certain described tract constituting a part of the father's estate. The decree of distribution did not give this tract, or a one-half interest therein, to the grantor, as happened in the Chever case, but did give the entire interest in that tract, in severalty, to the two other sons, James and Patrick, giving to the mother other lands in severalty, and to her and the last-named sons still other tracts in undivided shares. The proceeding was a partial partition as well as a distribution.

The grantees of James and Patrick sued John to quiet title to the tract conveyed to John by the mother. The mother was not a party to the suit. No appeal had been taken from the decree of distribution or partition and it had become final. The court said: "As no appeal was taken from this decree it became conclusive upon Bridget Lawler and upon her grantee, respondent herein. The question of an estoppel by virtue of her grant does not arise in the present case, *as the property distributed to her is not the same as that which she conveyed to the respondent.*" (The italics are ours.) The court seems to have considered that the mother, in the distribution proceedings, was the representative of her grantee for the purpose of securing distribution of the granted property to feed the grant, and that as she failed to obtain this relief, in a proceeding wherein she was an actor and where the court had jurisdiction to give it, she was concluded by the decree, and that her grantee, claiming only under her, was likewise concluded. That this is the true ground of the decision is further demonstrated by reference to the briefs in the case, wherein counsel for the plaintiffs in distinguishing it from the Chever case say: "If Bridget Lawler had received as distributee the land in controversy here, it would be the property of the defendant (John), but when the land goes to another heir with whom the defendant does not connect himself, he is not in the position of Mrs. Chever." And in the opinion the court distinguishes it from the Chever case in the same way, saying that what was decided in the Chever case was that the grantor who receives in distribution *the property granted by him to another* "is estopped from claiming the property under the distribution, as against his grantee." The general statements in the opinion in the Lawler case, to the effect that the decree of distribution binds all the world, that every person who may assert any interest in the estate is required to appear and claim it and that a grantee of an heir is as fully bound by the decree as the heir himself, are to be understood in the light of the fact that, although the grantee did not appear in that case, the grantor did appear, and in view of the all-important fact that the land granted was not distributed to the grantor, but to third persons. So understood, the case is not in conflict with the Chever case nor contrary to sound principles of law. It must be conceded that if, upon distribu-

tion and partition, the court decides and decrees that a particular heir is not entitled to a particular part of the estate, the decree, if not reversed on direct appeal, is conclusive both upon the heir and all persons claiming under him by grant or otherwise. This is the result of the principles declared in the Chever case and in all the other cases on the subject, and this appears to be all that was really decided in *William Hill Co.* v. *Lawler*, 116 Cal. 359, [48 Pac. 323]. That this was the view taken of that decision by its author, Justice Harrison, is clear from his reference to it in the subsequent opinion of *Martinovich* v. *Marsicano*, 137 Cal. 359, [70 Pac. 459], where he distinguishes the Lawler case by saying that in that case the land which the widow had conveyed to John was, by the decree of distribution assigned to others and not to the widow. The Lawler case, therefore, has no application to the case at bar, for here the property assigned by the decree of distribution to the German heirs, includes the property alleged to have been granted by them to Campbell.

The decision in *Martinovich* v. *Marsicano*, 137 Cal. 359, [70 Pac. 459], holds that a decree of distribution to the grantee of a devisee does not affect the lien of a judgment rendered against the devisee before the grant and prior to the decree. It also approves the principle of the case of *Chever* v. *Ching Hong Poy*, 82 Cal. 68, [22 Pac. 1081]. The case of *Crew* v. *Pratt*, 119 Cal. 149, [51 Pac. 38], has no bearing upon the precise question here involved. What was decided in that case was that a decree of distribution could not be disregarded or set aside upon the ground that it had erroneously declared and enforced a trust of a character which this court, in other cases, had held to be forbidden by law; that such a judgment, although erroneous and reversible upon direct appeal, was conclusive upon all parties thereto after it became final, no appeal having been taken.

Our conclusion is that the decree of distribution of the estate of Charles Lux, deceased, made in the manner we have stated, does not bar the right of the plaintiff, as successor of Campbell, to the property granted by the German heirs to Campbell before that decree was rendered, if that grant is otherwise valid.

2. Another question presented is that of the meaning and effect of the instrument referred to as "Exhibit B." It is

claimed by the respondent that when considered in connection with the previous agreement between the same parties it is not a conveyance and that, at most, it is only a mortgage by the German heirs to Campbell to secure to him the payment of his fees for the services which he agreed to render for them as attorney.

The first agreement, Exhibit A, was executed on January 6, 1888, nine months after the will of Lux was admitted to probate and at a time when the estate could not have been ready for settlement or distribution. By its terms Campbell agreed that he would represent the German heirs and act as their legal adviser throughout the administration of the estate, that he would institute all actions and proceedings necessary for the enforcement of their rights and defend them against all suits and resist all measures likely to prove injurious to them, that he would hasten by all lawful means the close of the administration of the Lux estate and secure as beneficial a distribution to them as the will and the law would permit and that he would do all other acts during said administration that might be deemed of benefit to their interests. In consideration of these covenants on his part the German heirs agreed to grant to him three hundredths of their respective shares of the estate, subject to the condition that if he should violate his part of the agreement, or neglect to perform the same fully and in good faith, the agreement should be immediately annulled, he should cease to be their attorney and should at once release to them all benefits to be derived by him from the terms of the agreement. It is to be noted that this agreement does not purport to be a present grant of a three-hundredths interest in their shares of the estate, that it is in terms only an executory agreement for a grant, and that it was to be annulled upon the happening of the condition. It also provided that Campbell should bear his own traveling and other personal expenses in performing his duties.

The second agreement, Exhibit B, was made on July 14, 1890, two years and six months after the first agreement. In the ordinary course of administration of an ordinary estate, the administration would have then advanced far toward final settlement. The decree of distribution was not made, however, until June 28, 1900, almost ten years thereafter. The

terms of Exhibit B, omitting the formal parts and substitut-
ing "German heirs" for "parties of the first part," and "Camp-
bell" for "party of the second part," are as follows:—

"The German heirs for and in consideration of the recon-
veyance and agreement hereinafter contained, and of the ser-
vices already rendered and to be rendered by Campbell,
hereby grant to said Campbell an undivided interest in all
the property of the estate of Charles Lux, deceased, equal to
three hundredths (3-100) of the shares and interests therein
devised to the German heirs by said decedent in his last will
and testament. In consideration of the foregoing grant to
him, Campbell, the said Campbell hereby grants and recon-
veys to the German heirs all the interest in said estate held
by him under any previous agreement or conveyance, and
especially a certain agreement and conveyance dated January
6, 1888, which is hereby by agreement of all the parties
hereto rescinded and annulled.

It is agreed that whatever compensation shall be allowed
to Campbell by the superior court of the county of San
Mateo, as attorney for absent heirs, shall be first applied to
reimburse him for all outlays made by him in rendering his
services to the German heirs, and the balance shall be credited
to the German heirs in final settlement.

It is fully understood that the compensation herein pro-
vided for shall embrace all services rendered in the adminis-
tration of said estate by Campbell up to and including the
final distribution thereof."

This instrument, on its face, expresses an absolute, present
grant to Campbell. There is certainly no presumption of law
that such an instrument is to be construed as a mortgage
rather than as a deed or assignment. There is no evidence
in the record, aside from its terms, to indicate that the parties
understood that the German heirs were to remain the debtors
of Campbell for the value of the services he had rendered and
should render. The terms of the instrument do not show
or express such understanding or intention. To the contrary
it declares that it is made "in consideration" of "services
already rendered and to be rendered," and that "the compen-
sation herein provided for" embraced all services to be ren-
dered up to final distribution, thus showing that it was con-
sidered as payment in advance for services rendered and to

be rendered, and that such payment was *made* by the conveyance, not that it was merely *secured* thereby. The release by Campbell of all interest held by him under the previous agreement and the cancellation of that agreement, shows also that the intention was to make the second conveyance absolute and not conditional, as it would be in effect if it were held to be only a mortgage. The German heirs thereby accepted Campbell's promise to render the services specified and divested themselves of the right to annul or revoke the grant if he failed to do so.

It is claimed that the conveyance is shown to be a mortgage by the clause relating to the settlement of allowances to Campbell by the court as attorney for absent heirs. The grant is absolute in terms and it clearly negatives the idea that any debt remained to be secured. To give the clause the effect claimed would, by mere construction, make it antagonistic to and destructive of the grant. "Repugnancy in a contract must be reconciled, if possible, by such an interpretation as will give some effect to the repugnant clauses, subordinate to the general intent and purpose of the whole contract." (Civ. Code, sec. 1652.) A repugnant clause will even sometimes be wholly rejected in order to accomplish the positive and obvious general purpose. (*Jackson* v. *Puget S. L. Co.*, 123 Cal. 100, [55 Pac. 788].) This clause is capable of a reasonable explanation and interpretation not inconsistent with the other parts of the agreement. A payment of fees to an attorney for absent heirs is not made for the general benefit of the estate but solely for that of the absent heirs. It is in the nature of a partial distribution in advance to them, and on final settlement such payments are charged to them as advancements on their shares. The grantors were evidently the absent heirs whom Campbell had been appointed to represent. The services for which the allowances were to be made were evidently the same services for which he was paid by the grant of three hundredths of their shares by these same heirs. If no adjustment were made between them of the court allowance he would be twice paid for the same service. It was necessary that he should in some way turn over these allowances to them. The obvious and proper way would have been for him to do so as fast as he received them. Apparently for his benefit and convenience, another plan was

adopted. This plan was that he should retain the allowances, pay therefrom his outlays, and adjust the balance on final settlement of the estate, by considering the same as an advancement solely upon the three hundredths going to him, or, as between him and them, "crediting" the same to them. As the grant included the personal property and money of a very large estate, this would seem entirely practicable. This is what is meant by the provision that these balances should "be credited to the German heirs in final settlement," and thus a double payment would be avoided. So understood, the clause carries out the main purpose of the agreement and does not destroy the previous absolute grant, nor involve the absurdity that an obligation which the grant discharged was nevertheless to be kept alive.

3. It is further claimed by the defendants that at the time the agreement was made Campbell was their attorney, that an agreement between them, made while this confidential relation existed, is presumed to have been obtained by undue influence on his part, that it is incumbent on him to rebut this presumption by evidence, and that, as no evidence was given on the subject, the court was justified in holding that the grant was void and that the plaintiff had no title thereunder. On the other hand the plaintiff claims that this was alleged in the answer as an affirmative defense, that the court made no finding on the issue, and that for that reason the decision is against law and the motion for new trial should have been granted.

The rule seems to be that in cases where it is sufficient for the plaintiff, suing in regard to property, to allege merely that he is the owner thereof, a denial of this allegation is sufficient to authorize the admission of evidence that the title under which plaintiff claims was absolutely void and not voidable merely, or any evidence to show that plaintiff had no title, and that in such cases a finding upon the fact of title or ownership is good without a finding of the particular facts upon which such title or want of title depends. (*Cooper* v. *Miller,* 113 Cal. 238, [45 Pac. 325] ; *Montecito V. Co.* v. *Santa Barbara,* 144 Cal. 594, [77 Pac. 1113] ; *Adams* v. *Crawford,* 116 Cal. 499, [48 Pac. 488].)

The rule is well established that the relation of attorney and client is confidential in character and that any contract en-

tered into between them while that relation continues, whereby
the attorney obtains an advantage from the client, is pre-
sumed to have been made by the client under the undue
influence of the attorney. (*Kisling* v. *Shaw*, 33 Cal. 440, [91
Am. Dec. 644]; Civ. Code, sec. 2235; 1 Story's Equity Juris-
prudence, secs. 310, 311; 2 Pomeroy's Equity Jurisprudence,
sec. 390.) In the section cited Mr. Pomeroy says: "The pre-
sumption always arises against the validity of a purchase or
sale between the client and attorney made during the exist-
ence of the relation. The attorney must remove that presump-
tion by showing affirmatively the most perfect good faith, the
absence of undue influence, a fair price, knowledge, intention,
and freedom of action by the client, and also, that he gave his
client full information and disinterested advice. . . . If all
these circumstances are proved the contract will stand; if not,
it will be defeated or set aside." The presumption does not
apply to a transaction in which the attorney openly assumes
a hostile attitude to his client. (*Johnson* v. *Fesemeyer*, 3 DeG.
& J. 22.) Nor is it applicable to a contract by which the
relation is originally created and the compensation of the
attorney fixed. The confidential relation does not exist until
such contract is made and in agreeing upon its terms the
parties deal at arm's length. (*Elmore* v. *Johnson*, 143 Ill.
513, [36 Am. St. Rep. 401, 32 N. E. 413].)

The record does not contain the answer in full, but merely
states its substance. It recites that a separate affirmative
defense was presented averring that Campbell was attorney
for the German heirs at the time of the execution of Exhibit
B; that it "was without consideration and was obtained by
said Campbell by the undue use of his influence as such
attorney; that the same was intended only as a mortgage
to secure the payment to said Campbell of his compensation
as such attorney; and that said compensation had been fully
paid"; and that they offered in this separate defense to pay
Campbell or the plaintiff any sums the court should find to be
due, from the German heirs for such compensation, and asked
"that said mortgage be adjudged to be satisfied and that the
same be delivered up and canceled." This is all that appears on
the subject of undue influence. It is not claimed or asserted
that the grant was void because obtained by undue influence.
Its cancellation was not asked on that ground, but solely upon

the ground that it was really a mortgage. Undue influence seems to have been averred in support of the claim that it was only a mortgage and as a fact tending to show the intention, rather than as a separate and independent defense. No evidence was given by the defendants in support of such a defense. They here rely wholly on the bare presumption aforesaid. The agreement of January 6, 1888, was introduced by the plaintiff. It created the relation of attorney and client between Campbell and the German heirs and fixed his compensation. It declared that for his services, when completed, he should receive the identical three-hundredths interest which the second agreement, Exhibit B, conveyed to him. It is admitted that all the services contracted for have been performed by him. The first agreement, to which no undue influences attaches, constitutes an admission by the German heirs that the value of the services to be performed equalled the value of the interest they afterwards granted to him, and it goes far to remove the presumption of undue influence in obtaining the grant. In order to lay a foundation for the affirmative relief of cancellation asked for in connection with this separate defense, it was necessary that a finding be made upon the facts therein averred. The fact that no such finding was made indicates that the defense was abandoned. In view of all these circumstances and this condition of the record, we do not think it would be fair to the plaintiff to hold that the error in considering the decree of distribution as a bar was harmless because a presumption against the validity of the grant would arise from the relations of the parties shown upon the face of the instrument, a presumption not pleaded as a cause for declaring the grant void. Justice requires that the case be remanded for a new trial so that the parties can intelligently state and meet the issue of undue influence if they so desire.

In view of the necessity of a new trial, it may be well to add that the part of the second agreement providing for the reimbursement to Campbell of his "outlays," did not materially change the obligations of the clients in respect to such outlays. The language should not be construed more liberally toward the attorney than its ordinary meaning requires. In the absence of a special agreement to the contrary, a client is bound to repay his attorney for all outlays made by him

in the payment of the expenses of carrying on the litigation and an attorney is bound to bear his own personal and traveling expenses. The word "outlays" when used in that connection does not ordinarily mean the personal or traveling expenses of the attorney, but refers to costs of suit and other expenses paid to third persons for similar purposes. It should be so construed in this agreement.

The order denying a new trial is reversed.

Angellotti, J., Sloss, J., Lorigan, J., and Henshaw, J., concurred.

MELVIN, J., dissenting.—I dissent from the second proposition advanced by Mr. Justice Shaw. I think the instrument "Exhibit B" was a mortgage.

Rehearing denied.

Upon denying the petition for a rehearing, the court in Bank, on December 20, 1909, rendered the following opinion:

THE COURT.—The petitions for a rehearing are denied. In response to the points urged therein, we will say that the opinion in the case upon the question of the construction and effect of the instrument referred to as "Exhibit B," and upon the question of undue influence, is predicated upon the facts stated in the opinion; that it appears that the case was tried and decided in the court below upon the theory that the plaintiff was barred by the decree of distribution and that the facts, *aliunde,* shown in the record, bearing upon the construction and effect of that instrument and undue influence in relation to it, are such facts only as were incidentally shown in the course of the trial of the other question. If the case is to finally rest upon the questions last mentioned, it is more in consonance with the correct administration of justice in a case involving, as this case does, large properties, that the questions be determined upon a new trial devoted directly to the examination thereof. Upon such a trial all the evidence bearing upon such questions can be introduced and new pleadings may be filed if necessary. The record now before us omits many facts which might be relevant to these propositions; at least we surmise that it does, from that

which does appear. If upon such a trial it should be claimed that the aforesaid instrument should be construed as a grant of a share *in value,* only, of the estate and not of the specific property, and that Campbell has already received all, or a large part of it, in money, thus satisfying the grant, or a due proportion of it, or if it should be asserted that he has elected to take the whole, or part of it, in money by retaining such sums as he may have received under the orders of the court as attorney for absent heirs, and, that the plaintiff is thereby estopped from now claiming any of it, or the ratable part of it, as a share of the real estate, or that the grant was obtained by undue influence, there is nothing in the opinion rendered which precludes such inquiries. No such questions have been heretofore presented, either here or in the court below, nor does the record here show that Campbell received any money as attorney for absent heirs.