[Civ. No. 3714. First Appellate District, Division Two.—May 2, 1921.]

## WILBUR F. BOARDMAN, Appellant, v. WILLIAM C. CRITTENDEN, Respondent.

[1] ATTORNEY AND CLIENT—SETTLEMENT BETWEEN PARTIES—FRAUD OF CLIENT—EVIDENCE—INDEPENDENT ADVICE.—Where a client of an attorney was a most capable business man and accustomed to drawing contracts and attending to many details of his business commonly intrusted only to attorneys, it cannot be said that there was an indispensable necessity that he should have received advice from another attorney in concluding extended negotiations between himself and his attorney wherein he transferred securities to his attorney in settlement of the attorney's claim against him for fraud in inducing the latter to make certain investments.

[2] ID.—TRANSACTIONS BETWEEN ATTORNEY AND CLIENT—HOSTILE ATTITUDE.—While it is true that in a transaction between attorney and client the *onus* is upon the attorney to prove the transaction was fair, and that he made a reasonable use of the confidence reposed in him and that he gave honest advice to his client concerning himself, these principles are applicable only to cases in which the client is dealing with the attorney under the influence of the confidence which he has reposed in him, and does not apply to a case where the attorney assumes openly the hostile attitude of an urgent and pressing creditor, and where the parties are held at arm's-length.

APPEAL from a judgment of the Superior Court of Alameda County. Everett J. Brown, Judge. Affirmed.

The facts are stated in the opinion of the court.

Fitzgerald, Abbott & Beardsley and Chickering & Gregory for Appellant.

Stanley Moore and Wm. A. Nunlist for Respondent.

LANGDON, P. J.—This is an appeal by the plaintiff from a judgment against him in an action in which he sought to rescind a certain agreement entered into between him and the defendant, and to have restored to him certain instruments and to have other instruments canceled. Said instruments were delivered by plaintiff to defendant in pursuance of the terms of said agreement herein sought to be

rescinded. The ground relied upon for rescission of said contract is that the defendant induced the plaintiff to make the agreement in question by means of duress, menace, fraud, and undue influence. The case was tried without a jury, and the findings and judgment were in favor of defendant.

Briefly, the facts show that the plaintiff and defendant had known each other since about 1908. Plaintiff was a business man, engaged in numerous enterprises, among which was the promotion and building of gas plants on the Pacific coast. Defendant was an attorney at law, and some twenty years younger than plaintiff. During the first few years of the acquaintance, defendant was engaged to attend to a few business matters for the plaintiff, but none of these seem to have been of much importance. Mr. Boardman, the plaintiff, had many diversified business interests, and they were conducted by corporations in which the W. F. Boardman Company held large amounts of stock. Mr. Boardman was the principal stockholder in the W. F. Boardman Company. In 1911 the Boardman Company owned all the stock in the Rogue River Valley Gas Company, a corporation. The principal asset of this last-mentioned company was a gas plant near Medford, Oregon, which plant had originally been constructed by the Boardman Company. In March, 1911, Mr. Boardman proposed to Mr. Crittenden, the defendant, that a new corporation be organized and that all of the stock and bonds of the Rogue River Company be transferred to the newly organized company, which was to be known as the Oregon Gas and Electric Company. Payment was to be made to the Boardman Company in stock and bonds of the new company, and in the transaction, the value to be given to the Boardman Company in exchange for its holdings in the Rogue River Company was agreed to be $175,000. At the time Mr. Boardman submitted this proposition he made certain statements to Mr. Crittenden regarding the character of the gas plant, its manner of construction, its actual cost, operating facilities, and future earning power. The particular representation out of which the real controversy arose was that the plant had been constructed by the Boardman Company at an actual cost of $126,000, without any commissions, discounts, or engineering fees of any kind, and

that all the materials used in the construction of said plant had been estimated at actual cost to the Boardman Company, which was in a position to secure such materials at a lower figure than contractors generally.

According to the findings, Mr. Boardman stated that because no engineering fees or commissions or expenses of supervision, etc., had been included in the estimated cost of the plant, the Boardman Company should receive a $50,000 profit on the construction of the plant, and its selling price to the new company should be fixed, therefore, at $175,000.

It was also represented to Mr. Crittenden that it was necessary to procure a certain amount of capital for operating expenses and future extensions of the plant, and it was suggested that Mr. Crittenden invest in the securities of the new company. The new company was organized, Mr. Crittenden attending to the legal details, and, thereafter, in reliance upon Mr. Boardman's representations as to the construction cost of the plant, Mr. Crittenden invested about $50,000 in the bonds of the Oregon Gas and Electric Company. These bonds, of the par value of $1,000, were sold at $900, and there was a certain amount of stock given as a bonus with the bonds. Later, by reason of assessments levied upon the stock, Mr. Crittenden's investment was increased until it was something over $67,000.

From the time of the formation of the Oregon Gas and Electric Company, in 1911, until the execution of the contract out of which this action arose (January 16, 1916), Mr. Crittenden was the secretary of the said company and was its attorney. He was also the attorney, in various matters, for other corporations in which either Mr. Boardman or the Boardman Company held controlling interests, and in some matters, during that period of time, he represented Mr. Boardman personally. The testimony and the correspondence between the parties show that a close business and social relation came to exist between them. Mr. Crittenden testified that it was not until some time in December, 1915, that he came to understand fully that Mr. Boardman had misrepresented to him the cost of the gas plant, which, at the trial of this action, he claimed was something between $67,000 and $80,000. At the time he

realized that misrepresentations had been made to him, he was representing the Boardman Company as its attorney in a certain action then pending in the supreme court of this state, entitled *Boardman* v. *Petch,* and in that case, the question of the actual cost of this gas plant was one of the subjects of inquiry. It appears that it was through his examination of the documents and files in this case against Petch, and through his conversations with the defendant Petch, that he became aware of the alleged misrepresentations. Upon this discovery, he determined to bring an action against Mr. Boardman for damages sustained by reason of the false representations, and also to bring suits for accounting and for other relief, the details of which are immaterial here.

On Saturday, January 15, 1916, Mr. Crittenden telephoned Mr. Boardman, who was then in Los Angeles. He told Mr. Boardman that he desired to discuss some business matters with him and that he would come to Los Angeles for that purpose. Mr. Boardman stated that he was leaving that night for his home in Berkeley, and it was agreed that a meeting should be had on Sunday morning, at Mr. Boardman's office in San Francisco. Mr. Boardman went to his office to keep the appointment, but upon discovering that he had forgotten his keys, telephoned to Mr. Crittenden and arranged to come to Crittenden's office. Upon his arrival there Crittenden immediately, according to the testimony of both parties, stated, in effect, that all business and social relations between them were at an end; that he, Crittenden, was through with Boardman, and intended to act only for himself and protect himself; that he would deal with Mr. Boardman not as his attorney, but as a co-investor in Oregon Gas and Electric Company. The negotiations between the parties continued all day and late into the evening and were finally consummated upon the following morning by the execution of the contract and delivery of the instruments now sought to be avoided.

There is a sharp conflict in the testimony as to the details of the interview and negotiations culminating in the contract. Mr. Crittenden and his associate, Mr. Nunlist, who was later called into the conference, and other witnesses testified in a manner which amply supports the

findings. It is true the testimony of Mr. Boardman and his business associate, Mr. Eckert, who was also called into the negotiations, as well as that of other witnesses produced by the plaintiff, contradict the testimony of defendant's witnesses; but this conflict in the testimony makes it necessary for us to accept the findings upon all disputed matters. Therefore, although we have carefully read the voluminous record, the findings are set forth herein as a statement of the disputed facts. It was found:

"That there was no relationship of attorney and client existing between the plaintiff and the defendant upon January 16 or January 17, 1916 (the dates when the agreement was negotiated and concluded), with respect to the Oregon Gas and Electric Company, or the stock and bonds held by either the plaintiff or the defendant therein; and that the relationship existing between the plaintiff and the defendant on said dates with respect to the Oregon Gas and Electric Company was that of co-investors only; that the defendant had acted as the attorney for the plaintiff and the W. F. Boardman Company in some specific matters during the time of their acquaintance, and on said January 16 and January 17, 1916, all of said matters had not been finally terminated and closed, but that the services therein had been substantially rendered some time previous thereto, and that at no time was the defendant the general attorney for the plaintiff except during a portion of the year 1914, nor authorized to represent the plaintiff, excepting with respect to matters forming the specific subject of his employments; and that at no time was the defendant employed as an attorney at law by the plaintiff to represent the plaintiff with respect to his interests in, or connection with the Oregon Gas and Electric Company, either as a stockholder therein, or otherwise; and that the defendant never acted as a general legal adviser, either sole or otherwise of the plaintiff."

The facts regarding the representations of Boardman to Crittenden are also found as recited hereinbefore, and it is found:

"That the defendant reasonably believed the said statements and representations of the said plaintiff . . . That he was then ignorant of the falsity of said statements as to the cost of said plant and the condition thereof; that in

entering into the transaction proposed by the plaintiff . . .
he relied upon the truth of said statements . . . and that
but for them, and his belief in them, and in each of them,
he would not have entered into this transaction; that acting
in reliance upon the truth of the said representations, and
of each of them, the defendant in the said month of March,
1911, agreed with the said W. F. Boardman, in effect, that
the plaintiff or the said W. F. Boardman Company, or both
of them, would sell to a corporation to be formed, the
said property of the Rogue River Valley Gas Company,
or all of their interest in that said property, at a price
which would be equal to the cost of the construction of
the said property, plus a profit of $50,000 and take in pay-
ment therefor bonds of the new company at $900 each and
fifteen shares of stock with each bond as a bonus, and
the said defendant would purchase fifty-five of the bonds
of the new company on the same terms, and pay for the
said bonds the sum of $49,500 cash. . . .

"That on January 16, 1916, the defendant stated to the
plaintiff as follows: That all matters between them were
at an end and that he (the defendant) was 'through' with
the plaintiff; that he had been requested by a certain
banker to see the plaintiff before filing suit against the
plaintiff, and to give the plaintiff an opportunity of settle-
ment; that he (the defendant) had been informed and
believed that the cost of the construction of the Rogue
River Valley plant . . . was not the sum of $125,000, or
any other sum in excess of approximately $80,000; that
defendant then and there further stated that the plaintiff
had, prior to and at the time of the investment by the de-
fendant in the Oregon Gas and Electric Company, repre-
sented that the construction cost of said plant was $125,000,
exclusive of commissions, discounts and engineering fees;
and that said plant was a well-constructed plant; and that
said representations were, and each of them was false; and
defendant further stated that at the time of the making of
said representations by plaintiff, said plant was not in good
condition, was not well constructed, but was poorly and im-
properly constructed; and defendant further stated that
the true and actual cost of said plant was known to said
plaintiff at the time of the making of said representations
by him as aforesaid; and defendant then and there further

stated that the true and actual cost of said plant was deliberately and intentionally misrepresented to the defendant by the plaintiff with the purpose of fraudulently inducing the defendant to invest his money in the Oregon Gas and Electric Company and to join in paying a purchase price of $175,000 for said Rogue River Valley Plant; that defendant then and there further stated to plaintiff that he intended to bring suit against plaintiff on account of said misrepresentations and that he (the defendant) desired the plaintiff to read over the complaints which he (the defendant) had already prepared; and that he (the defendant) believed the plaintiff had been guilty of looting and mismanagement of the Oregon Gas and Electric Company, and that he (the defendant) proposed to see to it that the plaintiff was put out of the presidency and the management of said company; . . . that the defendant then handed to plaintiff the three complaints received in evidence; . . . that the plaintiff read over one of said complaints in its entirety and glanced through the other two; that, thereafter, plaintiff offered to pay the defendant the amount of the latter's investment and interest for the stock and bonds in the Oregon Gas and Electric Company owned by the defendant providing the defendant would accept certain other securities in payment therefor, . . . That defendant believed that all of the allegations contained in said last-mentioned complaints were true and that he would be able to make legal proof of the same, at the time he handed said complaints to the plaintiff to read, and that at that time the defendant intended to file said complaints and prosecute the same.''

The court found that the defendant stated he would not accept the securities offered by plaintiff in payment for the stock and bonds held by the defendant in the Oregon Gas and Electric Company, and acquired by the defendant as a result of the representations made to him by the plaintiff. That thereafter, the plaintiff asked the defendant if the defendant had any objection to his (the plaintiff's) consulting with George H. Eckert; and that the defendant at once stated that he had no objection to such consultation, and that the defendant himself called up said George H. Eckert by telephone and that the plaintiff

thereupon asked said Eckert to come immediately to the defendant's office in San Francisco.

"That upon the arrival of said George H. Eckert, and after his refusal to answer questions relating to the construction cost of said Rogue River Valley plant, said George H. Eckert and the plaintiff retired · to a room in the offices of Crittenden & Simmons, and remained in conference there, with no one else present, for a period of more than an hour; that said Eckert was the secretary of the W. F. Boardman Company, and was and has been associated with said plaintiff in various business enterprises for a number of years.

"That at the conclusion of said conference between the plaintiff and said George H. Eckert, the plaintiff announced that he was willing to purchase the defendant's stock and bonds in the Oregon Gas and Electric Company by canceling the defendant's promissory note in favor of plaintiff, amounting to $20,000, by delivering to the defendant the promissory note of the Midland Land and Irrigation Company in favor of the plaintiff in the sum of $30,000, and by executing his promissory note for the balance, payable in two years, and bearing interest at five per cent; and that after some discussion between the plaintiff and the defendant as to whether the time for the payment of said last-mentioned note should be one or two years, or whether the interest should be five or six per cent, it was agreed between them that the time for payment thereof should be two years, and the interest thereon at the rate of six per cent per annum; and that thereupon the plaintiff himself suggested that such agreement should be immediately put in writing and executed, and that thereafter, and at the plaintiff's request, the said agreement was put in writing and executed by the plaintiff and defendant, and also an agreement was likewise put in writing at the plaintiff's request, whereby the defendant and William A. Nunlist, on behalf of themselves and their associates agreed not to participate in litigation against the plaintiff with respect to the Oregon Gas and Electric Company; and that after the execution of said agreements, the plaintiff himself suggested that a further meeting should be had at 9 A. M. on January 17, 1916, for the purpose of finally consummating the transaction, and making delivery of the

securities mentioned therein, and stated that in the meantime he (the plaintiff) would have the bookkeeper of the W. F. Boardman Company ascertain the exact amount of the defendant's investment plus six per cent.''

The court further found: ''That plaintiff voluntarily entered into the agreements with the defendant of January 16 and 17, 1916; that there was no fraud or duress exercised upon the plaintiff by the defendant upon either January 16, or January 17, 1916, or with respect to the agreements and transactions had between them upon those dates, or either thereof; and that the defendant did not advise, or attempt to advise, the plaintiff upon said dates, or either of them, either as an attorney at law, or otherwise; that neither the written contract executed between the plaintiff and the defendant on January 16, 1916, nor any of the agreements or transactions entered into or carried out by the plaintiff and defendant upon January 16 or January 17, 1916, were consented to, or in any way entered into, or carried out by the plaintiff wholly, or in any way due to any fraudulent misrepresentations on the part of the defendant, or other than as the voluntary act of the plaintiff; that no fraudulent misrepresentations were made to the plaintiff by the defendant either on January 16 or January 17, 1916; . . . that there was no menace exercised over the plaintiff by the defendant on January 16, 1916, and January 17, 1916, or either thereof, and there was no undue influence exercised over the plaintiff by the defendant upon said dates, or either of them, and that the agreements and documents executed by the plaintiff on January 16 and January 17, 1916, were executed by the plaintiff without being overcome by, and without having been subjected to, any menace, duress, or undue influence; that on January 17, 1916, in order to carry out the agreement executed by the plaintiff and the defendant on January 16, 1916, and in order to adjust certain other matters necessitated thereby, particularly the amount of the defendant's investment plus six per cent, plaintiff voluntarily, and without being subjected to duress, fraud, or undue influence, delivered to the defendant the documents, papers, and personal property described in plaintiff's complaint. . . . That plaintiff was familiar with the construction cost of the Rogue River Valley Gas plant at the time of the

sale of the capital stock of the Rogue River Valley Gas Company to the Oregon Gas and Electric Company, and the defendant was ignorant of the construction cost of said Rogue River Valley gas plant at that time, and that the plaintiff was aware on January 16 and January 17, 1916, of the facts in regard to said sale of the capital stock of the Rogue River Valley Gas Company, and was then familiar with, and had knowledge of, the construction cost of said Rogue River Valley gas plant; that no statements were fraudulently made by the defendant upon January 16, 1916, and January 17, 1916, or either thereof; that the defendant believed each and every statement and representation made by him during the course of the conversation between himself and the plaintiff upon January 16 and January 17, 1916, and that the written agreement executed by the plaintiff on January 16, 1916, was not signed by the plaintiff as a result of any misrepresentations made to the plaintiff by the defendant, nor because of any belief in the plaintiff that the defendant knew more of the facts in regard to the sale of the capital stock of the Rogue River Valley Gas Company and the construction cost of its plant than did the plaintiff himself.

"That the statement and representation made by the plaintiff to the defendant in March, 1911, and at the time the plaintiff induced the defendant to invest in the Oregon Gas and Electric Company, that the construction cost of the Rogue River Valley Gas and Electric plant, exclusive of interest, commissions, and engineering fees, was the sum of $125,000 was false; that the construction cost of said plant at that time was not to exceed $100,000; that at the time the plaintiff induced the defendant to invest in said Oregon Gas and Electric Company, no statement was made by the plaintiff to the defendant as to any moneys paid by the W. F. Boardman Company to J. R. Anderson; and no statement was made by the plaintiff to the defendant with respect to any refund or credit in favor of the W. F. Boardman Company by or from the Stacoy Manufacturing Company; and that said plant of said Rogue River Valley Gas Company was not a well-equipped plant at the time when said representations were made to the defendant by the plaintiff in March, 1911; and that at the time of the making of said representations and statements by the

plaintiff to the defendant in March, 1911, the plaintiff misstated the construction cost of said plant and its equipment and condition, with the intent and purpose of thereby inducing the defendant to invest in said Oregon Gas and Electric Company. . . . That the transactions and agreements of January 16 and January 17, 1916, between the plaintiff and the defendant were fair, just, and equitable.''

[1] This lengthy statement of the facts found by the trial court seemed necessary because of their complexity; but the legal question involved is conceded by the appellant to be but single. As stated by appellant's counsel, if, under the facts here, the attorney could repudiate his relationship to his former client, and could thereupon deal ''at arm's-length'' with him, without insisting, or at least suggesting to said client, that he secure another attorney to represent or advise him in the transaction—then the judgment should be affirmed. Our discussion of that question is expressly limited to the peculiar facts of the present case. It conclusively appears that Mr. Boardman was a most capable business man, accustomed to handling his affairs and making decisions. He did not request or suggest legal advice, according to the testimony of the witnesses for the defendant. Also, according to such testimony, he was accustomed to drawing contracts and attending to many details of his business which are commonly intrusted only to attorneys. He did not rely upon Mr. Crittenden, for he himself states that Mr. Crittenden told him at the beginning of the interview that he was ''through with him.'' He also testified that he mistrusted Crittenden, and expected most anything from him during the interview. Upon such a showing, we cannot hold that there was an indispensable necessity that he receive advice from another attorney. It was said in the case of *Kidd v. Williams,* 132 Ala. 140, 144, [56 L. R. A. 879, 31 South. 458, 459]:

''If the client is competent and capable, and with full knowledge of the transaction he proposes to settle with his attorney, acts deliberately, and voluntarily settles his account for services with his attorney, there would seem to be no indispensable necessity for independent advice on the subject. This would certainly be true when shown that there had been no fraud, deceit, or unconscionable advantage practiced by the attorney on the client, which would

rebut the presumption of a violation of confidence reposed, as much so as independent advice would do. All that is necessary is for the client to be placed in such a position as would enable him 'to form an entirely free and unfettered judgment, independent altogether of any sort of control.' If this does not appear, it would be necessary to show that the client had independent advice, in order to remove the presumption of unfairness. But when this presumption is otherwise removed, a rule that would, in addition, require independent advice would seem to be arbitrary and unnecessary. 'It is only when confidence is abused that courts of conscience interfere,' and this essential fact in such cases may be shown by any competent evidence. Independent advice is simply a means of proof to establish the fairness of the settlement, and that it was voluntarily entered into free from undue influence. This is made clear under the decisions of this court.''

The abundant evidence in the record as to Mr. Boardman's business ability and keen mentality, as well as of his large experience in complicated and varied business enterprises, makes peculiarly applicable the further language of the opinion in the last cited case:

''Of course, the satisfaction necessary for a court of equity to have, in order to sustain or set aside a settlement of the kind, would vary according to the circumstances of, and the evidence presented in, each cause. The age and experience or inexperience of the client, his mental and physical strength, or the lack of it, and general capacity to know, appreciate, and understand the matter of a settlement with his attorney, should always be considered.''

The briefs contain lengthy discussions of the finding with reference to the business relation between Boardman and Crittenden, the specific contention of appellant being that in so far as Mr. Crittenden was attorney for companies in which Mr. Boardman was a stockholder, he was, in reality, Mr. Boardman's attorney, and was under the same obligation toward Mr. Boardman that would arise out of the fiduciary relationship toward the corporations.

We do not find it necessary to decide this question here, because if we concede appellant's position—that the relationship of attorney and client existed between Boardman and Crittenden with reference to the Oregon Gas and

52 Cal. App.—29

Electric Company—to be correct, nevertheless, under the facts here, we should be compelled to affirm the judgment.

[2]   While it is true that in a transaction between attorney and client the *onus* is upon the attorney to prove the transaction was fair, and that he made a reasonable use of the confidence reposed in him and that he gave honest advice to his client concerning himself, these principles are applicable only to cases in which the client was dealing with the attorney under the influence of the confidence which he had reposed in him, and does not apply to a case where the attorney assumes openly the hostile attitude of an urgent and pressing creditor, and where the parties are held at arm's-length. (*Johnson* v. *Fesemeyer*, 3 De Gex & J. 13, 22, [44 Eng. Reprint, 1174].)   The last cited case has been followed in this state in the case of *Cooley* v. *Miller & Lux*, 156 Cal. 510, 523 et seq., [105 Pac. 981]. In that case it was said:

"The rule is well established that the relation of attorney and client is confidential in character and that any contract entered into between them while the relation continues, whereby the attorney obtains an advantage from the client, is presumed to have been made by the client under the undue influence of the attorney. (*Kisling* v. *Shaw*, 33 Cal. 440, [91 Am. Dec. 644]; Civ. Code, sec. 2235; 1 Story's Equity Jurisprudence, secs. 310, 311; New Pomeroy's Equity Jurisprudence.)   In the section cited, Mr. Pomeroy says: 'The presumption always arises against the validity of a purchase or sale between the client and attorney made during the existence of the relations.   The attorney must remove that presumption by showing affirmatively the most perfect good faith, the absence of undue influence, a fair price, knowledge, intention and freedom of action by the client, and, also, that he gave his client full information and disinterested advice, . . . If all these circumstances are proved, the contract will stand; if not, it will be defeated or set aside.'   The presumption does not apply to a transaction in which the attorney openly assumes a hostile attitude to his client. (*Johnson* v. *Fesemeyer*, 3 De Gex & J. 22, [44 Eng. Reprint, 1174].) Nor is it applicable to a contract by which the relation is originally created and the compensation of the attorney fixed.   The confidential relation does not exist until such

contract is made and in agreeing upon its terms the parties deal at arm's-length. (*Elmore* v. *Johnson*, 143 Ill. 513, [36 Am. St. Rep. 401, 32 N. E. 413].)''

In the case of *Black* v. *Riley*, 20 Cal. App. 199, [128 Pac. 764], this rule of law was again recognized, the court saying:

''The court refused to give an instruction requested by defendant, as follows: 'You are instructed that an attorney, dealing with a person about to become a client as to his contract for payment for services, occupies no different position than any other two persons contracting for payment of services. No presumption of undue influence applies to a transaction where an attorney is in a hostile attitude to his client, nor in case of the contract by which the relation of attorney and client is originally created and the compensation of the attorney fixed.'

''The court was justified in so doing. While the first and last proposition stated are correct statements of the law, it is not true that 'no presumption of undue influence applies to a transaction where an attorney is in a hostile attitude to his client,' and the authority cited by appellant in support of such proposition does not sustain him. It is said in *Cooley* v. *Miller & Lux*, 156 Cal. 510, [105 Pac. 981], that 'The presumption does not apply to a transaction in which the attorney *openly assumes* a hostile attitude to his client.' This is a very different proposition from the one that 'No presumption of undue influence applies to a transaction where an attorney is in a hostile attitude to his client.' Whenever an attorney, for his own benefit, deals with his client, in regard to property that is the subject of his employment, he is in a hostile attitude to his client, but is still bound to the exercise of the utmost good faith toward his client in such transaction, and the burden is upon him to rebut the presumption of undue influence. It is only when he openly assumes a hostile attitude that his transactions with his client will be free from the presumption of undue influence on the part of the attorney.''

It is admitted by the appellant that in the transaction here the attorney assumed an attitude which was openly and vigorously hostile to the client—and that it was so expressly stated and not left to inference. It also appears

that Mr. Boardman did not trust the defendant and did not rely upon him, and that Mr. Boardman was in every way a person fully competent to manage his own affairs and to decide upon his course of conduct. He had independent advice from his associate Eckert and spent considerable time in a private conference with Eckert before reaching his decision and concluding the agreement to purchase Crittenden's holdings. He suggested the settlement, insisted upon its immediate consummation, and negotiated at some length about the details thereof. He also went to his home Sunday evening and was away from Mr. Crittenden during that night and until about noon the next day, when he voluntarily executed and consummated the agreement. It was found by the court that the actuating motive of Mr. Boardman was his knowledge of his own misrepresentations, and that the contract between the parties was fair, just, and equitable.

The judgment is affirmed.

Nourse, J., and Sturtevant, J., concurred.