[L. A. No. 8672. In Bank.—April 1, 1926.]

In the Matter of the Estate of BERTHA SCHUBERT WITT, Deceased. HAROLD CARLSON, Respondent, v. CHARLES LANTZ, Appellant.

[1] ESTATES OF DECEASED PERSONS—WILL CONTEST—AGREEMENT TO WILL PROPERTY—VALIDITY OF AGREEMENT—DETERMINATION.—In a will contest it is not the duty of the court before submitting the contest of the will to the jury to determine whether or not the testatrix had entered into a valid agreement, as contended by defendant, prior to her death, whereby she agreed to will all of her property to a person other than the contestant, for the purpose of establishing whether or not the contestant had a right to contest the will, as that question is one for the jury.

[2] ID.—MOTION FOR INSTRUCTED VERDICT—WHEN PROPERLY DENIED.— In a will contest, based upon several grounds, where a general motion by the defendant for an instructed verdict is not directed to each separate ground of contest, if the evidence is sufficient to sustain one or more of the causes of action, the motion is properly denied.

[3] ID.—SUFFICIENCY OF EVIDENCE.—In this will contest it is held that there was sufficient evidence to sustain the verdict as to two of the grounds of contest.

[4] ID. — FRAUD AND UNDUE INFLUENCE — RELATION OF ATTORNEY AND CLIENT—BURDEN OF PROOF—PRESUMPTIONS.—In a will contest based upon fraud and undue influence, where the relation of

2. See 26 Cal. Jur. 1102.

4. Burden of proof as to undue influence with relation to wills, notes, 17 L. R. A. 494; 36 L. R. A. 724, 733. See, also, 26 Cal. Jur. 759; 28 R. C. L. 144.

attorney and client existed between the testatrix and the beneficiary under the will, the burden of proof is upon the defendant to overcome the presumption of fraud and unfair dealing.

[5] Id. — Dealings Between Attorney and Client — Presumption of Fraud—Evidence.—All dealings between an attorney and his client for the benefit of the former are not only closely scrutinized, but are presumptively invalid on the ground of constructive fraud; and such presumption can be overcome only by the clearest and most satisfactory evidence that the transaction was fair and equitable and no advantage was taken by the attorney, and that the client was fully informed on all matters relative to the transaction and was so placed as to be able to act understandingly and to deal with the attorney at arm's length.

[6] Id.—Wills—Confidential Relations—Presumption of Undue Influence.—A presumption of undue influence arises from proof of the existence of a confidential relation between the testatrix and the beneficiary coupled with activity on the part of the latter in the preparation of the will.

[7] Id. — Entry of Verdict — Section 628 of Code of Civil Procedure—New Trial.—A new trial will not be granted for the reason that the verdict was not entered by the clerk as required by section 628 of the Code of Civil Procedure, as this section is directed to the duties of the clerk and his failure to enter in the minutes a court order does not prevent the action taken being the order of the court.

[8] Id. — Special and General Verdicts — Special Interrogatories Discretion.—In this will contest it is held that the special verdicts were not inconsistent with the general verdict and that there was no error by the court in refusing to submit to the jury the special interrogatories prepared by the defendant, as the submission of special issues is discretionary on the part of the trial court.

---

(1) 40 Cyc., p. 1324, n. 78, 79.    (2) 40 Cyc., p. 1333, n. 62.    (3) 40 Cyc., p. 1165, n. 86.    (4) 40 Cyc., p. 1151, n. 96    (5) 6 C. J., p. 686, n. 22.    (6) 40 Cyc., p. 1152, n. 9.    (7) 29 Cyc., p. 815, n. 7. (8) 38 Cyc., p. 1907, n. 8.

APPEAL from a judgment of the Superior Court of Los Angeles County. Elliot Craig, Judge. Affirmed.

The facts are stated in the opinion of the court.

---

6. Evidentiary force of circumstances that one benefited by a will was the draftsman thereof, or was active in procuring its execution, note, 28 L. R. A. (N. S.) 270. See, also, 26 Cal. Jur. 652; 28 R. C. L. 145.

Charles Lantz, Winslow P. Hyatt and Frederic C. Huber for Appellant.

Marshall Stinson and Noel C. Edwards for Respondent.

LENNON, J.—This is an appeal by the sole beneficiary named in the will of Mrs. Bertha Schubert Witt, also known as Mrs. Bertha Carlson, from the judgment rendered by the court below in favor of the contestant, and from the order denying a new trial.

Bertha Schubert Witt, also known as Bertha Carlson, died on the sixth day of February, 1923, in the county of Los Angeles. She was at the time of her death about sixty-two years of age and had been a resident of Los Angeles for some twenty-eight years. During that time she had dealt in real estate and had bought property, subdivided it and built bungalows thereon. Her affairs, however, got into a very tangled condition with the result that most, if not all, of her property was covered by mortgages. The record shows that she owned equities in the following property which will prove pertinent to a discussion of the case and which for convenience in discussion will be grouped in three parcels. Parcel I—Lot 15, Block 13, Elysian Heights Tract; a five-room cottage, known as No. 2049 Echo Park Avenue; a lot known as the westerly 33 feet of Lots 8, 9, and 10, Carlson Terrace Tract. Parcel II—Agreement of purchase of Lot 11 of the Carlson Terrace Tract. Parcel III—Lots 8, 9 and 10, except the westerly 33 feet thereof, with three cottages known as 2029, 2033, and 2037 Echo Park Avenue; and Lots 17 and 19, Block 28, Angeleno Heights, fronting on Sunset Boulevard.

In August, 1914, Mrs. Witt entered into a contract with one A. J. Borden whereby he agreed to take over all of her equities in the various properties which she owned, give her a promissory note for the purchase price of $6,000 and give her as security a blanket second mortgage on all of the property deeded to him. Pursuant to said agreement a note for $5,000 was given by Borden to her. Another note for $1,000 was given to her by Borden and she in return deeded to him a lot, No. 10, Angeleno Heights, not included in the agreement, which lot he turned over to one Spicer, who held an attachment against Mrs. Witt's property and thereby

obtained a release. The arrangement with Mr. Borden did not prove satisfactory to Mrs. Witt and some difficulty arose over the fact that Mrs. Witt, contrary to Mr. Borden's wishes, recorded her mortgage from him. In February, 1916, an accounting was had between Mr. Borden and Mrs. Witt, whereby Borden deeded back to Mrs. Witt a portion of the property deeded by her to him. This property consisted of the properties heretofore designated as Parcel I. Legal title to the property redeeded to Mrs. Witt by Borden subsequently came into the possession of Mrs. Anna Colkins by deed from Mrs. Witt. Lot 15, Block 13, of Elysian Heights Tract, had been sold for delinquent taxes and the unrecorded tax deed held by one T. A. Davis, a resident of Goshen, Indiana. And on No. 2019 Echo Park Avenue a first mortgage was held by one Tucker and a second mortgage in the sum of $800 was held by another person. Legal title to the remainder of Mrs. Witt's property remained in Borden. In April, 1920, Mrs. Witt called upon Mr. Charles Lantz, an attorney at law, at his office in Los Angeles relative to the unrecorded tax deed held by Mr. T. A. Davis. Mr. Lantz was a cousin of Mr. Davis and transacted business either for him or in his name in Los Angeles. According to the testimony of Mr. Lantz, Mrs. Witt explained to him the nature of her business difficulties and he undertook to straighten them out for her. On April 8, 1920, he secured a deed from Mrs. Anna Colkins to all of the property of Mrs. Witt to which she held legal title. Said deed was made and executed not to Mrs. Witt but to Mr. T. A. Davis. Several business conferences were held according to Mr. Lantz and on April 20, 1920, Mrs. Witt mailed to Mr. Lantz a letter in which she suggested that in return for $20 or $22.50 a month during her lifetime, she would turn over to him any and everything she had coming from Borden. The letter was dated ''Hamburger's Ladies Rest Room, Los Angeles, California,'' and on the reverse side thereof, in Mrs. Witt's handwriting, was the following sentence, ''I would also be at your side when & where needed.'' Thereafter several conferences were held and Mr. Lantz drew up a draft of a plan which he submitted to her. The substance of the plan was that Mrs. Witt was to deed all of her property to Lantz, he would undertake to clear up the title thereto, he would be repaid for the money which he advanced, each party was to be entitled

to one-half of the net income and upon her death all of the property was to belong to him. Several drafts were made but the final agreement of the parties is evidenced by three separate instruments dated May 17, 1920. The first instrument provided that Lantz was to purchase Lot 11 of the Carlson Terrace Tract to which Mrs. Witt held an agreement of purchase and was to turn it over to anyone Mrs. Witt should designate upon the payment to him within two years of the cost of the lot and the expenses incurred thereon, together with interest at ten per cent. The second instrument provided that one-half of the net profit realized from the handling of the lot, known as the westerly 33 feet of Lots 8, 9, and 10 of Carlson Terrace Tract, should belong to Charles Lantz, and the one-half to any person Mrs. Witt should designate. The third instrument provided that in consideration of Lantz taking necessary steps to foreclose the Borden mortgage Mrs. Witt granted to him a one-half interest in all of the property held by Borden and in the net proceeds of any sale thereof, and that Mr. Lantz should first be repaid for any money which he might have expended upon the recovery of said property. It will be noted that these instruments provided generally for a 50–50 split of the property and net income or proceeds and made no provision for the taking of the ownership of the property by Mr. Lantz upon the death of Mrs. Witt.

In August, 1920, Mr. Lantz commenced suit in the name of Mr. T. A. Davis, to whom Mrs. Witt had assigned the mortgage against Borden, for the foreclosure of the mortgage. It seems that sometime prior thereto Mr. Borden had permitted the first mortgage on a couple of the pieces of property to be foreclosed and had not redeemed them and Mrs. Witt was in danger of losing all of her security. Borden, according to his testimony, offered to deed the property back to Mrs. Witt without the prosecution of the suit, but Mr. Lantz insisted on going on with the foreclosure. During the course of this suit a deposition of Mrs. Witt was taken on December 30, 1920, by Mr. Lantz.

On January 3, 1921, Mrs. Witt wrote to Mr. Lantz a letter wherein she stated that she wished him to prepare a paper whereby she would leave all of her real estate and property to "my beloved kind friend and protector, Charles Lantz." The letter continued:

"He will during my lifetime never see me in want, take care of me while I live, and my body, when I have passed away, I like to be buried in Rosedale Cem. I will in case I sell anything, come to him and give an account and the amount of such sale I will hand over to him, or if in need hold or ask part of it, just as I or he sees best for me. I also wish, that Mr. Lantz give my two boys, which have me entirely forgotten—give them each the trinkets, etc., which are really theirs. Should he see fit to add anything he may do so. Just as he wills it. Should I live a little longer I will gladly do anything for my friend Mr. Lantz that I am competent to do. All of property which comes through Borden can be transferred at once, and in which I will do my utmost to see that he gets it. Mr. Lantz can also make a statement to the effect he or his successor will see to it that I will not be in want of the necessities of life. Mr. Lantz will know best how and what else to write—as I have complete trust and confidence in him. God Bless Him.

"Bertha Schubert Witt."

On January 5, 1921, a will drafted and prepared in the office of Mr. Lantz was executed by Mrs. Witt wherein she stated that she had been neglected by her two sons and willed all of her property to Mr. Charles Lantz. The will was witnessed by two employees of Mr. Lantz.

On March 7, 1921, a settlement was arrived at with Borden and he, according to a written agreement with Mrs. Witt, deeded all of Mrs. Witt's property which had remained in his hands to Mr. Lantz. On March 9, 1921, Mr. T. A. Davis, who held the deed to the property from Mrs. Anna Colkins, deeded the property over to Mr. Lantz. Mr. Lantz also purchased the title to Lot 11 as agreed upon in the first instrument of May 17, 1920. The legal title to all of Mrs. Witt's property came, therefore, into the hands of Mr. Lantz.

Mrs. Witt's health during this period was not good. She was very emaciated, weighing scarcely 100 pounds, and on different occasions she had had hemorrhages. She was taken seriously ill in September, 1922, and passed away on February 6, 1923. A doctor and nurse who attended her were paid by Mr. Lantz and arrangements were made by him to have her buried in Rosedale Cemetery. Mrs. Gage, a friend of the decedent, notified Harold Carlson, a son of the de-

cedent residing in Clarksville, Arizona, who had not been theretofore informed of his mother's illness, and he came to Los Angeles and insisted upon taking charge of the funeral arrangements.

A petition for the probate of Mrs. Witt's will was filed by Mr. Lantz wherein he alleged that Mrs. Witt's estate consisted solely of personal property. Harold Carlson, decedent's son, entered a contest of the will executed in Mr. Lantz's office which went to trial upon the issues of whether or not Mrs. Witt was of sound and disposing mind at the time of the execution of the will and whether said will was procured by the fraud and undue influence of the sole beneficiary, Charles Lantz. Another ground of contest, that a subsequent holographic will had been executed by Mrs. Witt whereby she left all of her property to Mrs. Gage, was abandoned during the trial.

Special interrogatories were given to the jury, as follows: "Was Bertha Carlson of sound or unsound mind on the fifth day of January, 1921? Was the execution of the will dated January 5, 1921, obtained through undue influence of Charles Lantz? And, Was the execution of the will dated January 5, 1921, obtained through fraud of Charles Lantz?" The jury brought in a verdict in favor of the contestant and answered the interrogatories to the effect that Bertha Witt, also known as Bertha Carlson, at the date of the execution of the will was of unsound mind and that the will was procured through the undue influence and fraud of Charles Lantz. Judgment was rendered accordingly, from which judgment defendant appeals.

[1] Preliminarily the point was made by defendant that it was the duty of the trial court before submitting the contest of the will to the jury, to determine whether or not the contestant had any interest in the estate of the deceased which would entitle him to contest the will. It is defendant's theory that the testatrix having entered into a valid agreement during her lifetime whereby she agreed to will all of her property to the sole beneficiary named in her will, the estate of the testatrix was entirely absorbed in her lifetime and nothing remained in which the contestant had any interest and he had, therefore, no right of appeal. It was not the duty of the trial court to determine in advance of the trial upon the contest of the will whether or not the testatrix had entered into a valid agreement prior to her

death whereby she agreed to will all of her property to a person other than contestant. The cases cited by the defendant in support of his contention that an heir at law may have no interest in an estate entitling him to a contest of a will contain the element of estoppel, for they are cases wherein the contestant had an agreement with the testatrix whereby he agreed for a consideration not to contest the will of the testatrix. The court held that by reason of said agreement the contestant was estopped to contest the will. In the instant case the agreement which it is claimed deprived the contestant of any right to contest was an alleged agreement between the testatrix and another person, which agreement, it is alleged by the contestant, was a part of a fraudulent scheme on the part of the beneficiary whereby he sought to secure all of Mrs. Witt's property. No element of estoppel here exists. And a decision by the court that the agreement was or was not valid by reason of the fact that it was or was not procured by fraud or undue influence would be a determination by the court of the question which the contestant, by code provision, is entitled to have determined by a jury. (Code Civ. Proc., sec. 1312.)

Appellant's main contention is that the trial court erred in (1) denying the defendant's motion for an instructed verdict at the close of the contestant's case, (2) in denying the motion for an instructed verdict at the close of the entire case, and (3) in denying the motion for judgment notwithstanding the verdict.

[2] The motion made by appellant for an instructed verdict was a general motion setting forth the reasons or grounds for making the motion. A ruling was not asked upon a motion directed to each separate ground of contest and if, therefore, the evidence was sufficient to sustain one or more of the causes of action, the motion was properly denied by the trial court. (*Pacific Vinegar etc. Works* v. *Smith*, 152 Cal. 507, 513 [93 Pac. 85]; *Estate of Relph*, 192 Cal. 451, 455 [221 Pac. 361].)

The essential question presented by the above specification of errors is whether or not there was substantial evidence to support the verdict upon either of the three grounds of contest.

[3] After a careful examination of the record, we are satisfied that, although the jury from the evidence adduced upon the entire case may well have arrived at a contrary

conclusion, nevertheless there is sufficient evidence to sustain the verdict as to two of the grounds of contest.

Inasmuch as weakness of mind may constitute a very important circumstance in the determination of whether or not fraud or undue influence was exercised, we deem it well to first discuss and dispose of the question of the mental capacity of the testatrix to make a valid and effective will.

Contestant contends that evidence in support of the finding of the jury upon this phase of the contest is to be found in the following facts: (1) The will was an unnatural will, (2) the will contained statements which were not true in fact, (3) letters and writings of the decedent contain incoherent and contradictory statements, (4) the decedent failed to understand the nature of her own act and her properties, (5) decedent's physical condition was extremely precarious at the time of the execution of the will, (6) acts and declarations of the decedent were not those of a woman of sound mind, and (7) the opinion of intimate acquaintances was that she was not of sound mind.

Briefly summarized the proof offered to establish the foregoing facts is as follows: (1) The will was an unnatural will in that it disinherited the two sons of the decedent and there is in the record no testimony of any estrangement or ill feeling between the testatrix and her two sons; (2) the statement in the will that her two sons had failed to show any interest in her welfare or communicate with her for a long period of time, although she lived in Los Angeles for twenty-six years and her place of residence was known to her two sons, and had by their neglect compelled her to become dependent upon the aid of others, was not true if considered in conjunction with the testimony of Harold Carlson to the effect that he had previous to his marriage in 1918 sent her sums of money ranging from $25 to $40 per month and had visited her at least once a year and had written to her every two or three weeks; (3) the statement in the letter of January 3, 1921, to the effect that "I will in case I sell anything, come to him and give an account and the amount of such sale I will hand over to him, or if in need hold or ask part of it, *just as I or he* sees best for me," indicates the vague and indefinite grasp of the subject about which she was writing; the peculiar statement on the reverse of the letter dated "Hamburger Rest Room," "I would also be at your side when and where

needed," indicates at the least eccentricity of mind; the deposition taken at the time of the foreclosure of the Borden mortgage shows by its content that Mrs. Witt's mind was not normal. Mrs. Witt when asked in her deposition to whom she had given a copy of the Borden contract replied, "The man in the moon," repeating this several times. When asked if she had delayed filing the mortgage until February, 1916, she answered, "—because I was a damn fool a good thing I did too—My God, it was an angel dwelling above me." When asked if she owned the note which was being sued on, she responded, "I live on air and the smell of beef steaks and being sick to death—understand me—now ask again." And another time she interposed after the question had been asked her whether she had guaranteed certain notes, "It was a thin one." Her answers to many questions were irrelevant and very often vague and indefinite. Mr. Person, attorney for Borden, testified that he determined there was no chance of getting a rational deposition out of her, so he quit. (4) Although the letter of January 3, 1921, purported to call for the disposal by will of all her property and the immediate transfer of the property held by Borden, nevertheless in June, 1921, Mrs. Witt spoke about her property on Echo Park Avenue and Baxter Street and stated that she had other property. Another witness testified that in the fall of the same year, Mrs. Witt stated that she owned three houses on Echo Park Avenue and the Sunset Boulevard lot. This occurred after she had signed the written agreement for Borden to transfer the property directly to Mr. Lantz and indicates that she did not understand the nature of her act when writing the letter of January 3, 1921, claimed by Lantz to have been written just two days before the execution of the will. (5) During the years immediately preceding her death and at the time of the transactions here involved the decedent was in a very bad condition physically. She was so emaciated that she seemed to be but skin and bones and weighed but 100 pounds. She was subject to hemorrhages and was at times bedridden. (6) There is testimony of witnesses relative to the acts and declarations of the decedent tending to show she was not of sound mind, to the effect that Mrs. Witt was afraid to take the medicine prescribed by the doctor for fear it was doped and would kill her, that she ate scarcely anything at all and neighbors at different

times had had to bring in food to her, that she ate grass and
flowers, that at the time of the taking of her deposition in
the foreclosure of the Borden mortgage she would stop and
cry and rest quite a bit before answering, and her answers
to questions propounded were at times irrelevant and non-
sensical and many times vague and indefinite, that Mr. Per-
son, attorney for Borden, met her on the street and she
asked him to show her the way to a lecture, as she did not
know which way to go, although she had been there many
times, that one afternoon about 2 o'clock she had answered
the door with her hair all down and straggly and with a
"half-crazy" look in her eyes and asked the old friend
who had called, what she meant by coming at that time of
the day and refused to permit her to enter although a shower
had come up and the friend needed shelter.  There is testi-
mony that Mrs. Witt was an exceedingly slovenly house-
keeper and lived in a state of fearful disorder and confusion.
Photographs were introduced in evidence to more graphi-
cally portray to the jury the indescribable disorder of the
premises and the condition of the house in which Mrs. Witt
had lived for some time.  No words could describe the con-
fusion and almost unbelievable disorder of the house and it
was the testimony of an intimate friend that this was the
usual condition of the house in which Mrs. Witt lived.  It
was the testimony of Harold Carlson that subsequent to his
mother's death he had found in the house occupied by her
an instrument to punch one's body with, about a foot long
with about fifty needles in it.  (7) It was the opinion of Mr.
Roughton, who had offices with Mr. Lantz during all the
time that Mrs. Witt called to consult with Lantz, that she
was not of sound mind.  He based this opinion upon the
fact that her conversations with him were of a rambling
character.  He stated that she would come into his office
several times in one afternoon and would talk to him about
astrology and fortune-telling.  She repeatedly asked him for
the date of his birth so that she might give him a horoscope.
She put her hand on his head and told him what fine silky
hair he had and told him that he would make a great lover.
She kept this up for a period of a year and a half to two
years.  According to this witness, Mrs. Witt did not seem
to be capable of carrying on a very intelligent conversation
on any particular subject.  He testified that "the woman's
conversations, the woman's dress, the offensive odor that pre-

vailed when she was around, not being according to the accepted ideas of hygiene, would lead me to believe the woman was of unsound mind; plus her continued wrangling and heckling me as to the kind of a great lover I would make, and putting her hand on the back of my head, and feeling the growth of hair on the back of my head, and going away five or ten minutes, and coming back and doing it all over again; doing that for about two years. Her conversations at those times was all in pieces, rambling, nothing.'' Mr. Moll, who qualified as an intimate acquaintance, having lived next door to Mrs. Witt for many years as her neighbor, testified that in his opinion she was not of sound mind. He based his opinion upon the way she would walk around ''making funny actions, she would come around like she was in a trance and acted as if she was really off somewhat.'' She would come out of the house about 11 or 12 o'clock in the morning with a cup of coffee and a roll and walk around the house and back again. On one occasion she set her cup of coffee down on the front steps and left it there for a week. Things were scattered all around her house and when he asked her if she could not keep house a little better she replied that she was a blue blood and wasn't born to housework. On another occasion she pulled weeds out of her garden and threw them on the steps and sidewalks and left them lay there for weeks. She would come out of her house into the yard at times barefooted and dressed in her wrapper and when she went downtown she would dress up with three or four or five strings of beads. Mrs. Ruth Hastings, who became a tenant of Mrs. Witt in May, 1921, testified that she didn't seem to be a woman of sound mind, that she was ''kind of unbalanced on horoscopes and fortune-tellings.'' Several times a day Mrs. Witt would ask her what day of the month she was born on and upon being told would say, ''Well, Mercury is mind, and mind is God, and you are Mercury.'' In half an hour she would come back and ask her the same thing. This witness testified that at no time that she knew Mrs. Witt was Mrs. Witt perfectly rational. As impeachment of Mr. Lantz's testimony that he believed her to be of sound mind, there was introduced the testimony of Mr. Roughton to the effect that in reply to a question by him after Mrs. Witt had been in the office whether or not Mr. Lantz did not think the old lady was a little peculiar, Mr. Lantz replied, ''Well, I don't

know as I would pay much attention to what she said. She is kind of flighty.''

Conceding, without deciding, that the foregoing narrative of facts and circumstances relied upon to show the mental incompetency of the testatrix at the time the will was executed to be not sufficient as a matter of law for that purpose, nevertheless we deem their narration to be needful and illuminating in the discussion of the points presented upon the other grounds of contest, namely, the issues of fraud and undue influence.

[4] The burden of proof to establish all of the elements of fraud or undue influence was not, in the instant case, upon the contestant, as is the usual situation upon the contest of a will. The burden was upon the defendant, by reason of his relationship of attorney to Mrs. Witt, to overcome the presumption of fraud and unfair dealing which is automatically raised by the law as a protection to a client against the strong influence to which the confidential relation naturally gives rise. [5] All dealings between an attorney and his client for the benefit of the former are not only closely scrutinized, but are presumptively invalid on the ground of constructive fraud and such presumption can be overcome only by the clearest and most satisfactory evidence. Not only must the attorney offer clear and satisfactory evidence that the transaction between himself and his client was fair and equitable and no advantage was taken by him, but he must also offer proof that the client was fully informed of all matters relative to the transaction and was so placed as to be able to act understandingly and to deal with the attorney at arm's-length. (*Kisling* v. *Shaw,* 33 Cal. 425 [91 Am. Dec. 644]; *Cooley* v. *Miller & Lux,* 156 Cal. 510 [105 Pac. 981]; *Clark* v. *Millsap,* 197 Cal. 765 [242 Pac. 918].)

Clearly, Mr. Lantz was acting as attorney for Mrs. Witt from the time she first negotiated with him concerning the clearing up of the titles to her various properties until some time after her will was drawn. The direct admission of Mr. Lantz himself upon the witness-stand that he acted as attorney for Mrs. Witt is sufficient to establish the relationship. And an examination of the transactions between Mr. Lantz and Mrs. Witt leaves no doubt. It cannot be said that the fact that part of the negotiations included the terms of Mr. Lantz's payment is proof that Mr. Lantz and Mrs.

Witt were dealing at arm's-length and negatives the confidential relationship. There is abundant evidence that Mrs. Witt was not dealing at arm's-length with Mr. Lantz, but relied upon him and trusted him implicitly.

The fact that an advantage was obtained by the attorney is evidenced by the terms of the will itself wherein he was bequeathed all of the property of the testatrix. Defendant insists that there is no proof of any advantage obtained by him by reason of the fact that the will was the result of a fair and equitable contract between himself and the decedent whereby she agreed to will him all of her property in return for an agreement by him to see that she should not during her lifetime be in want. Conceding this, merely for the purpose of argument, it will suffice to say that the evidence adduced by the contestant shows that, having in mind the condition of Mrs. Witt's health, Mr. Lantz stood to gain more by the contract than Mrs. Witt. The *prima facie* showing of contestant in this particular was, therefore, sufficient to show an advantage obtained by the attorney by virtue of his confidential relationship.

Moreover, the will was drafted and drawn in the office of Mr. Lantz and was signed by two of his employees as witnesses. Mr. Lantz testified that it was prepared in his office principally by himself. Also one of the subscribing witnesses testified that Mr. Lantz was in the room and talked to Mrs. Witt about the will before she signed it. [6] A presumption of undue influence arises from proof of the existence of a confidential relation between the testatrix and the beneficiary "coupled with activity on the part of the latter in the preparation of the will." (*Estate of Higgins*, 156 Cal. 257, 261 [104 Pac. 6, 8]; *Estate of Baird*, 176 Cal. 381 [168 Pac. 561]; *Estate of Nutt*, 181 Cal. 522 [185 Pac. 393].)

Defendant sought to overcome the presumption of undue influence by establishing the fact that the will was executed pursuant to an agreement, evidenced by the letter of Mrs. Witt of January 3, 1921, and his acceptance thereof, whereby Mrs. Witt agreed to will him all of her property in return for his promise to see that during her lifetime she would not be in want. Defendant insists that this contract was fair and equitable and no advantage was taken of Mrs. Witt. According to defendant he not only gave his time and services, but he expended from $6,000 to $7,000 in

purchasing and redeeming the property from prior liens and the expenses of litigation. He points out that he paid to Mrs. Witt $60 a month, $175 for doctor's bills, $250 for nurse's bills, as well as the taxes upon the property during the two years preceding her death. However, if the precarious condition of Mrs. Witt's health be considered, it is evident that, although it was possible for a few years that Lantz would not make a profit from the contract, nevertheless the chances were that within a comparatively short time he would by the original expenditure of $6,000 or $7,000 obtain as sole owner legal title to property which brought in an income of approximately $1,200 per year. It is true that Mr. Lantz did furnish Mrs. Witt $60 per month and did permit her the use of one of the houses rent free, but this is not proof that under the agreement he was obligated to furnish this amount and that he might not at his discretion give her considerably less. There was testimony of Mr. Roughton to the effect that Mr. Lantz told him he had an agreement with Mrs. Witt, but that whether or not he gave her anything was a matter of his discretion. In short, the possibilities at the time of the making of the agreement were that the contract would prove decidedly advantageous to Mr. Lantz.

If it be conceded that the first agreement, evidenced by the three instruments of May 17, 1920, was perfectly fair and legitimate and was not the first step in the consummation of a scheme whereby Mr. Lantz was to gain all of Mrs. Witt's property, nevertheless, the contract whereby Mr. Lantz was to secure all of the property in return for his promise to see that Mrs. Witt did not want for necessities was advantageous to him. According to that agreement he was entitled to one-half of the property and one-half of the proceeds and Mrs. Witt was entitled to the other half. This half would bring her in an income closely approximating $60 per month and would entitle her to have one-half of her house rent free. The agreement between Mr. Lantz and Mrs. Witt practically amounted to this: Mr. Lantz obligated himself to provide Mrs. Witt with the necessities of life, which, considering the fact that she was entitled to an income from the property of almost $60 a month, would not obligate him to pay more than $10 per month at the most, and to pay the doctor's and nurse's bills if she became ill. Mrs. Witt, in return for this, obligated herself to will him the

one-half interest in the property. Bearing in mind the condition of Mrs. Witt's health, the inference is warrantable that the terms of the contract were apt to prove very advantageous to Mr. Lantz.

To strengthen the presumption of undue influence, the contestant introduced evidence to the effect that Mrs. Witt was advised by Mr. Garroway, an employee of Mr. Lantz, to accept the agreement. And contestant points out that the promise of Mr. Lantz contained in his letter of acceptance of Mrs. Witt's offer of January 3, 1921, to the effect that he will "see to it that she will not be in want, that she will have substantial, of the necessities of life," and closing with the statement, "in case I die before Mrs. Witt, I desire my son to fulfill this agreement," is a hazy, indefinite proposition and left a great deal to the discretion in his hands and imposed no obligation upon his successors. Particularly is this true when considered in conjunction with Mr. Lantz's statement to Mr. Roughton that whether he paid her or not was a matter of his discretion. As further circumstances to strengthen the presumption there was offered evidence of the active participation of Mr. Lantz in the actual preparation of the will, to be considered in conjunction with the testimony of Mr. Lantz that the will was the product of several conferences and his admission that the will might have been drafted prior to the letter of instruction of January 3, 1921; evidence that Mr. Lantz took advantage of Mrs. Witt's weakness for horoscopes by writing to her that he was inclosing her a pamphlet on luck and astrology; evidence that although Mrs. Witt had for years wished upon her death to be cremated, she included in her will the statement that she wished to be buried in Rosedale Cemetery.

Bearing in mind that the burden was upon the defendant to remove any doubt of the fairness in his dealings with the decedent whereby she may have been induced to will him her property, and to establish by clear and satisfactory proof that he had acted in the utmost good faith and taken no unfair advantage, it may be safely said we think that the jury, having in mind the testimony adduced as to the mental and physical condition of the decedent, was warranted in arriving at the conclusion that the defendant had not sustained the burden of proof upon him and, therefore, found that the will was procured by the undue influence of the sole beneficiary.

Upon the issue of fraud in the procurement of the will much of the evidence which has been set forth in connection with undue influence bears also upon this phase of the case. Thus, to overcome the presumption of fraud, defendant points to the testimony relative to the fairness and equitableness of the contract entered into between himself and the decedent.  The testimony *pro* and *con* relative to the active participation of the beneficiary in the preparation of the will is also pertinent to the issue of fraud.  There is in addition, however, evidence peculiarly pertinent to the issue of fraud. This consists in evidence of the peculiar manner in which Mr. Lantz dealt with the property of Mrs. Witt.  It is contestant's contention that evidence of Mr. Lantz's dealing with Mrs. Witt's property tends to establish the fact that Mr. Lantz concealed from Mrs. Witt the fact that he (Lantz), through Davis, had acquired title to her property and that at the time he was making a contract with her based upon the clearing up of the titles, he had in effect title to the property himself, and that she was by reason of her ignorance of the true state of facts induced to enter into the contract and to make her will naming him as sole beneficiary.

It will be remembered that on April 8, 1920, almost immediately after Mrs. Witt called at Lantz's office relative to her property, he procured Mrs. Colkins to execute a deed of the property, designated as Parcel I, to Mr. T. A. Davis. The first mortgage upon No. 2049 Echo Park Avenue—which was included in this parcel—had been foreclosed previously and Mr. Lantz, by securing the second mortgage, effected a redemption of this property in the name of Mr. T. A. Davis. Davis thereafter assigned to Mr. Lantz the sheriff's certificate of sale and the sheriff's deed was made to Lantz as grantee.  Mr. Lantz had previously purchased in his own name lot 11 of Carlson Terrace Tract, designated as Parcel II, to which Mrs. Witt held an agreement of purchase.  In August, 1920, Mr. Lantz commenced suit for the foreclosure of the Borden mortgage in the name of Mr. Davis, Mr. Lantz testifying that Mrs. Witt had assigned the Borden note and mortgage to Mr. Davis.  And despite the fact that Borden offered to deed the property back to Mrs. Witt, Lantz insisted on going on with the foreclosure.  On March 7, 1921, Borden deeded all of the property designated as Parcel III to Mr. Lantz and on March 9, 1921, T. A. Davis

deeded to Lantz the property previously deeded to him by Mrs. Colkins.

Mr. Lantz testified that Mr. Davis held title to all the property involved in this controversy which stood in his name, as trustee for himself (Lantz) and Mrs. Witt. It is insisted by contestant that Mrs. Witt was never informed of the fact that Mr. Davis was acting as trustee for herself and Mr. Lantz and must therefore have believed that title to the property was held by a stranger, that Mr. Davis was merely a "dummy" for Mr. Lantz and did not know that he was a trustee of the property. A letter sent by Mr. Davis to Mr. Lantz justifies the inference that Mr. Davis was used as a "dummy" of Mr. Lantz and his name used by Mr. Lantz in his own business transactions. There is in the record the testimony of Mr. Person, attorney for Mr. Borden, to the effect that some time in November, 1920, after the deed from Mrs. Colkins to Mr. Davis—he asked Mrs. Witt who Mr. Davis was and where he lived and she said she did not know anything about him. There is also testimony to the effect that Mrs. Witt stated that her attorney was getting all her property and she did not see how he could do that as she had never deeded any of her property. This testimony indicates that Mrs. Witt did not understand the facts of the trusteeship. Mr. Lantz testified that he took the deed from Mrs. Colkins in the name of T. A. Davis in order that a deficiency judgment outstanding against Mrs. Witt should not be satisfied out of that property. He did not explain, however, why the deed was not taken directly in his name, since the same result could have been reached thereby. There is also some doubt from his testimony whether he actually learned of the deficiency judgment prior to the procurement of the deed from Mrs. Colkins to Davis or not.

Ignorance on the part of Mrs. Witt of the fact of the trusteeship of Mr. Davis for herself and Mr. Lantz—conceding that the testimony that Davis was holding the property as trustee for them is true—and a belief by her that title to part of her property was in the hands of strangers could not but have prevented Mrs. Witt from dealing understandingly with her property. It was the duty of Mr. Lantz as her attorney to make full disclosure of all facts in order that his client might act understandingly and at arm's-length from himself.

The testimony of Mr. Lantz that the property was held by Mr. Davis as trustee is somewhat weakened by the fact that in the petition for the probate of the will of Mrs. Witt, Mr. Lantz stated that no real property was left by Mrs. Witt, her entire estate consisting of personal property of the value of about $250. If Davis had acted as trustee, Mrs. Witt's equitable interest in the property included in Parcel I had never been divested and should have been included in the statement of her estate.

Some support to the inference that the facts were not fully and freely disclosed is to be found in evidence that instruments involved in the transactions were not recorded for a considerable time after they had been executed.

Contestant also points out that in several instances direct testimony on the part of Mr. Lantz which, if true, would have strengthened his case materially was upon cross-examination changed or considerably weakened. For example, Mr. Lantz testified that the will was executed subsequent to the letter of instructions of January 3, 1921, but upon cross-examination admitted that it might have been drafted previously and that several conferences were held relative to it. Relative to the fact that Mrs. Witt was informed of who Mr. Davis was, Mr. Lantz testified at one time that he informed her at the time of the negotiations about the Colkins deed of April 8, 1920, and at another time he testified that he told her when the suit was filed by Davis for the foreclosure of the Borden mortgage in August, 1920. Also, Mr. Lantz testified that the last two pages of Mrs. Witt's deposition which were clear and lucid were given at the time of the taking of her deposition, whereas Mr. Hyatt testified that she came in later and brought them. Contestant points out that the testimony upon these various points dealt not with inconsequential matters, but matters of vital interest in the case.

Testimony was introduced by the defendant tending to show a plausible explanation for the manner in which the property had been handled and seeking to negative the circumstances tending to support the presumption of fraud. The jury were, however, the judges of the credibility of the witnesses and were not bound to accept as true the testimony so offered. They may have, in their discretion, eliminated it entirely from their consideration. At the most, it merely created a conflict.

We are of the opinion that, bearing in mind that the burden of proof was upon the defendant, there is sufficient evidence to warrant the conclusion of the jury that the procurement of the will was the result of fraud on the part of the sole beneficiary.

[7] We find no merit in the contention that a new trial should have been granted for the reason that the verdict was not entered by the clerk as required by section 628 of the Code of Civil Procedure. Section 628 is directed to the duties of the clerk and the failure of the clerk to enter in the minutes a court order does not prevent the action taken being the order of the court. (*Von Schmidt* v. *Widber,* 99 Cal. 511 [34 Pac. 109].)

[8] The special verdicts were not inconsistent with the general verdict and there was no error by the court in refusing to submit to the jury the special interrogatories prepared by the defendant. Submission of special issues is discretional on the part of the trial court. (*Oberholzer* v. *Hubbel,* 36 Cal. App. 16, 19 [171 Pac. 436].)

With regard to the other specifications of errors, we are satisfied that they would not suffice to warrant a reversal of the judgment. (Const., art. VI, sec. 4½.)

The judgment and the order denying a new trial are and each is affirmed.

Richards, J., Seawell, J., Curtis, J., Waste, C. J., and Lawlor, J., concurred.

Rehearing denied.