[Civ. No. 22499.    Second Dist., Div. Two.    Mar. 18, 1958.]

Estate of MAY C. HALL, Deceased.    NETTIE BEAVERS et al., Appellants, v. SECURITY-FIRST NATIONAL BANK et al., Respondents.

Moss, Lyon & Dunn, Sidney A. Moss and Charles B. Smith for Appellants.

Roland Maxwell, Paul H. Marston and Richard W. Olson for Respondents.

KINCAID, J. pro tem.*—May C. Hall died on February 23, 1955, leaving a will dated December 10, 1947, and a subsequent will dated July 16, 1954, purporting to revoke all former wills. The latter will, hereinafter referred to as ''the will,'' is the subject of this appeal. The appellants, Nettie Beavers and Walter W. Beavers, are its proponents and Nettie Beavers is its sole beneficiary with the exception of two bequests of one dollar each. The 1954 will was denied probate, the 1947 will was admitted to probate and the appeal is from that order. Respondents are the executor and beneficiaries under the 1947 will.

The trial court found that the 1954 will was executed and obtained while the decedent was acting under the undue influence of appellants who occupied at that time a confidential relationship toward the decedent.[1] The sole ground of appeal is that these findings are unsupported by the evidence.

---

*Assigned by Chairman of Judicial Council.

[1]Finding 3 states: ''That at the time said deceased signed said purported Will dated July 16, 1954, she was acting under the undue influence of Nettie Beavers and Walter W. Beavers, who at all times mentioned herein were and now are husband and wife. That said deceased was at the date of the execution of said Will of the age of 87 years, and was weak and ill in body and mind. That her physical condition on said date was such as to permit the circumvention of her Will. That on said date, and prior and subsequent thereto, said deceased was being cared for in the home of Nettie Beavers and Walter W. Beavers and was under their complete charge and control. That on said date the said Nettie Beavers and Walter W. Beavers occupied a close and confidential relationship toward said deceased. That on said date and for a long time prior thereto and for a long time thereafter, the said Nettie Beavers and Walter W. Beavers kept the said May C. Hall under their constant and personal supervision. That following said date, the said Nettie Beavers and Walter W. Beavers refused to permit friends and acquaintances to see said deceased, except in the presence of said Nettie Beavers. That following said date, all requests made by friends and acquaintances of said deceased and by her attorney to see the said deceased alone were denied, except that on one occasion when the said deceased insisted that she be permitted to consult her attorney alone the said attorney did talk with said deceased privately, and except that

468

■ Under such circumstances our power as an appellate court begins and ends with the determination as to whether there is any substantial evidence contradicted or uncontradicted which will support the finding of fact. (*Primm* v. *Primm*, 46 Cal.2d 690, 693 [299 P.2d 231]; *Estate of Poole*, 156 Cal.App.2d 768, 772 [320 P.2d 62].) Viewed in that light, the evidence discloses the following:

■ Mrs. Beavers with her husband, Walter W. Beavers, owned and operated a rest home for elderly people and decedent Miss Hall had resided in the Beavers' home as a paying guest since February 29, 1954. The will, which is on a printed form, was prepared by Mr. Beavers. Mr. and Mrs. Beavers were both present when the will was executed and the witnesses to the will were neighbors of the Beavers who had never before met decedent. On the same day as the execution of the will, namely July 16, 1954, Miss Hall executed a general power of attorney in favor of Nettie G. Beavers which in addition to its general powers contained the specific power to sign checks for the payment of bills and services. This power of attorney was notarized by one of the witnesses to the will. Also on the same day, Miss Hall executed a typewritten agreement for life care[2] to be furnished by Nettie Beavers and this document was witnessed by the daughter and

on another occasion one of the friends of said deceased was allowed to remain alone for a few minutes with said deceased. That prior to said 16th day of July, 1954, the said Nettie Beavers and Walter W. Beavers, for the sole purpose of asserting an undue influence over said deceased, threatened to discontinue their care of her in the event she did not execute documents which would cause them to receive all of her property upon her death. That Nettie Beavers and Walter W. Beavers were active in procuring the execution of the purported Will dated July 16, 1954, and that prior to said 16th day of July, 1954, Walter W. Beavers, the husband of Nettie Beavers, without any instruction, request or direction whatsoever from said deceased, prepared the document bearing date of July 16, 1954, and on July 16, 1954 presented the same to the said May C. Hill in the presence of other persons for signature. That solely by reason of the overpowering and undue influence of the said Nettie Beavers and Walter W. Beavers over the said May C. Hall at said time, the said May C. Hall signed said document. That said Nettie Beavers had, at all times, been fully and adequately compensated for the care provided for said deceased and that under the terms of said purported Will dated July 16, 1954 she would have unduly profited.''

[2]'' AGREEMENT

''WHEREAS it is the intention of the undersigned to enter into a mutual agreement as follows:

''May C. Hall hereby proposes to execute her last will and testement [sic] and power of attorney in favor of Nettie G. Beavers. Nettie G. Beavers for such consideration does hereby propose to care for May C. Hall for the remainder of her natural life, and to provide services

son-in-law of the Beavers. At the time these documents were executed, Miss Hall was 87 years of age and there was the testimony of her physician who saw her three days after the execution of the will that on that date she was "rather arteriosclerotic and senile."

At the time of the execution of the will, the power of attorney, and the life-care agreement, Miss Hall had no independent legal advice as to their terms or conditions or concerning the disposition of her property. Mrs. Beavers did not have a certificate of authority to enter into a life-care contract as required by section 2350, Welfare and Institutions Code. It is also significant that at the time she executed the life-care agreement, Miss Hall was and had been paying $150 per month to the Beavers for her care and that the life-care agreement makes no diminution in the sum to be paid. In return for her promise to make a will and power of attorney in favor of Nettie G. Beavers, Miss Hall received no consideration other than that, if any, which might exist in Mrs. Beaver's agreement "to handle the affairs of May C. Hall in a business like manner in case of illness or other, which might prevent her from handling her affairs, and to make accounting to her as she may request."

Vera Bautch was one of the witnesses to the will and with respect to what was said by Mr. Beavers to Miss Hall before the signing of the power of attorney Mrs. Bautch testified as follows: "He just explained to her that she had to sign it, that the notary was here to notarize her signature." When asked what Mr. Beavers said about the will, Mrs. Bautch testified: "He said, 'This is your will,' and she said, 'Read it to me.'" Mrs. Bautch also testified that the operation took but two or three minutes. There is evidence that Miss Hall

---

as she is now receiving or may need in the future. May C. Hall shall continue to pay Nettie G. Beavers $150.00 per month to cover expenses.

"Nettie G. Beavers further agrees to handle the affairs of May C. Hall in a business like manner in case of illness or other, which might prevent her from handling her affairs, and to make accounting to her as she may request.

"This agreement is irrevocable on the part of either party.

"WITNESS our hand and seal this 16th day of July 1954.

SIGNED: May C. Hall

Nettie G. Beavers."

WITNESS: Mary R. Larson

Roger Q. Larson

herself did not ask the witnesses to sign her will. Mr. and Mrs. Bautch had been friends of the Beavers since 1950.

Both Mr. and Mrs. Beavers were present when the preparation of the will was discussed and according to the testimony of Mrs. Beavers, Miss Hall became ill at three a.m. on July 17, 1954. The Bautches testified that the will was signed in Miss Hall's room which was on the first floor of the house. Mrs. Beavers testified that she saw Miss Hall reading the will on the 16th of July or sometime shortly before that date in Miss Hall's room and she further testified that Miss Hall was then upstairs in the southeast wing or room. Mrs. Beavers also testified that Miss Hall indicated a desire to stay in the Beavers' home. Mrs. Beavers told her that "the county said she would have to come in by law." Mrs. Beavers stated that the life-care agreement was signed in the upstairs room in the southeast corner; that July 16, 1954, was a Saturday and that Mr. Beavers was at home that day because of the fact that it was Saturday. July 16, 1954, actually fell on a Friday.

In a later proceeding involving the guardianship of Miss Hall, Mrs. Beavers directly and positively testified that the will was prepared by the notary. At the probate proceedings Mr. Beavers testified that he had an Underwood typewriter and that he had prepared the will on July 15 on that typewriter. He also testified that he had had only one typewriter. When his attention was called to certain erasures on the power of attorney, he testified specifically that he had made a mistake and thereupon had changed the date. He also testified that the actual date, "16," was inserted on the day the documents were signed but left blank when they were prepared on the 15th. When his attention was called to the difference in the typewriting appearing in the power of attorney, he refused to offer any explanation and said that all of the typewriting had been done on the same typewriter. The Beavers were handling business matters for Miss Hall as was established by Mr. Beavers' testimony that he had a file "in our safe" which contained among other things cancelled checks and that he made bank deposits for Miss Hall.

Mr. Glenn L. Davis testified to many visits to the decedent in company with his wife and that they were permitted to see decedent alone until July of 1954 after which Mrs. Beavers was always present during their visits except that on one occasion Mrs. Beavers went out for a few minutes. It is significant that the first visit of Mr. Davis and his wife to Miss Hall in July of 1954 occurred on July 17, the day after the execu-

tion of the will. Mrs. Davis also testified to the foregoing facts and in addition testified to a conversation with Mrs. Beavers on July 17, 1954, in which Mrs. Beavers said that Miss Hall could not visit at the Davis home. This testimony is as follows:

"THE COURT: This is when you came on the 17th?

"THE WITNESS: Yes. I went to get Miss Hall to make a dress for her. We had made this date. She gave me an old dress to rip up, and I had ripped this dress up, and pressed it in order to make a new dress, and I went to get her to make this new dress, and, when I got up to the porch, why, Mrs. Beavers was watering the lawn, and she came up behind me, and I said to Miss Hall, 'Now, we are going to make the dress. We have come for you.'

"Q. BY MR. MAXWELL: Was Miss Hall out of doors also? A. Yes. She was sitting on the front porch.

"Q. Now, just go ahead and tell us what happened? A. So I asked her to get ready, we would go make the dress today, because we had talked sometime ago about changing the dress, and Mrs. Beavers said, 'No, Miss Hall can't go home with you today,' and I said, 'Any [sic] why not?' And she said, 'It is too warm for her to go out today.' I said, 'We live in an apartment house on the first floor, and it is quite comfortable, and I have an electric fan,' and I had planned to make this dress that day, and she said, 'Well, she cannot go today. She isn't feeling well. She just doesn't feel well enough to go out.'

"Q. Was there anything else? Was that the entire occurrence? A. I said to her, 'Well, I guess Miss Hall could speak for herself. Miss Hall, what do you say,' And she put her little hand up like this (illustrating), and shook and said, 'I guess I can't go.'

"Q. Was there anything else? A. No. That was all. I turned around and went home."

Mrs. Lorena Dwyer also visited Miss Hall. Before July 16, 1954, Mrs. Beavers never stayed in the room during the visits. Mrs. Dwyer saw Miss Hall about 9:30 in the morning of July 16, 1954. On that day Mrs. Dwyer had called the Beavers' home and was told that Miss Hall could not go out with her. She became concerned and went to the home to see Miss Hall. She found Miss Hall on the porch and Miss Hall cautioned her to "talk very low" because she was afraid the Beavers might be listening. On this occasion Miss Hall said, "it would just be too bad for her if they [the Beavers] found that she

was going to move.'' When Mrs. Dwyer went back on the 17th, she was unable to rouse anyone.

On the 18th Mrs. Dwyer visited Miss Hall and Mrs. Beavers went into the room with her. When the doorbell rang Mrs. Beavers allowed it to ring seven or eight times before she left to answer it and came back in a minute. During Mrs. Dwyer's visits Miss Hall occupied the upstairs room in the southeast corner. Many times when Mrs. Beavers was present during Mrs. Dwyer's visit, Mrs. Beavers told Miss Hall that she ''wasn't able to talk.'' On another occasion she told Miss Hall that she ''had talked all she could.'' A few months before July, 1954, Miss Hall told Mrs. Dwyer: ''. . . that they told her if she expected to be treated as one of the family that she should sign a will to them, and also a power of attorney, and then she would be treated as one of the family.''

Mrs. Bertie Cummings testified that after July 16, 1954, there was never an occasion when she was permitted to visit with Miss Hall alone, except on one occasion Mrs. Cummings and her husband were left in the room alone for a few seconds after Mrs. Beavers had told Miss Hall that she was not supposed to talk.

Paul Marston, an attorney associated with Roland Maxwell, testified that when he visited Miss Hall at the Beavers' home following his receipt of a document requesting the delivery to Mrs. Beavers of Miss Hall's bank books, etc., Mrs. Beavers stayed in the room.

Roland Maxwell testified that he was an attorney and had known Miss Hall for seven or eight years. During this time he had custody of her saving account book and safe deposit key, along with other papers belonging to her. From time to time he went with Miss Hall to the bank to assist her in transacting her business. On June 21, 1954, he called for Miss Hall at the home of Mrs. Freeman on North Raymond Avenue in Pasadena, and took her to the bank. Soon after that he left for Europe and did not return until August of 1954, and on August 27, 1954, went to the Beavers' home to see Miss Hall. Mrs. Beavers was not willing to admit him to Miss Hall's room and after he saw Miss Hall, Mrs. Beavers refused to leave the room until Miss Hall indicated that she wished Mrs. Beavers to do so. Before she left the room, she said to Miss Hall, '' [Y] ou know what our agreement is, and you tell him what our agreement is.'' Miss Hall then said that she was not entirely sure what had taken place during Mr. Maxwell's trip, but that the Beavers had ''had her sign some papers, a

will, she thought. They had told her that there was a copy in the closet, but she hadn't been able to find it, and that she thought or was afraid that this will left everything to Mrs. Beavers." Miss Hall then indicated to Mr. Maxwell that she would like him to look at the papers which had been signed. Mr. Maxwell's request that he be given the opportunity to examine the papers was denied by Mrs. Beavers. On the day the petition for the appointment of a guardian for Miss Hall was filed, Mr. Maxwell again visited the Beavers' home. His testimony concerning the conversation with Mrs. Beavers about Dr. Toy was as follows: "A. Well, I asked Mrs. Beavers if she knew that Dr. Toy had been there in the forenoon of that day. I came in the afternoon, and he had been refused admittance, and she said that she had dismissed Dr. Toy, and I said, 'You dismissed him?' She said, 'Miss Hall dismissed him through me. She did not want to pay any more doctor bills.' I said, 'Doesn't Miss Hall need a doctor?' She said, 'No. We want to get her well.' "

Richard W. Olson who was also associated with Mr. Maxwell visited the Beavers' home on July 30, 1954, during Mr. Maxwell's absence in Europe and was told by Mrs. Beavers that "We are handling all of her affairs now." He was also told that Miss Hall was asleep and he could not see her.

David A. Black, a qualified handwriting expert, testified that the will in question was written on a Smith-Corona standard elite typewriter. The entire document with the exception only of the letters "r-i-x" in the words executrix and the words "to serve without bond" in the last paragraph were typed at one sitting without removing the document from the typewriter. In the July 16th date, the "16th" was in alignment and appeared to have been written at the same time as the remainder of the document with the exceptions above noted. He testified that the power of attorney was written on two different typewriters, (1) an Underwood elite type of old vintage, and (2) a Smith-Corona elite of late vintage, the same machine on which the will was written. Mr. Black went on to point out the precise portions of the power of attorney written on each machine. He also testified that the original date on the power of attorney was 25 May which had been erased and 16 July written over it. The life-care agreement was all typed at one time, including the date, on the Smith-Corona elite of late vintage.

After the testimony of Mr. Black, Mr. and Mrs. Beavers did not testify again and no explanation of any kind was

offered by them concerning the disparity between their testimony and that of Mr. Black as to the documents in question.

There is other testimony indicating the control which the Beavers maintained over Miss Hall both before and after the execution of the will, but it appears unnecessary to detail it here. The conflicts and inconsistencies in the testimony of both Mr. and Mrs. Beavers were sufficient to justify the trial court in disbelieving their testimony that they had exercised no improper influence over Miss Hall in securing her signature to the various documents.

The fact that before and at the time of the execution of the will, the Beavers and particularly Mrs. Beavers, stood in a confidential relationship toward Miss Hall is apparent from the evidence. She was living in their home as a paid patient or guest; she relied upon them for her material and physical needs such as food, shelter, and nursing care; and there is evidence that Mr. Beavers at least transacted business for Miss Hall by making bank deposits and keeping a file of some of her papers in the safe.

It is also obvious from the evidence that Mrs. Beavers, the chief beneficiary of the will, was active in its preparation and execution. Under such circumstances it is elementary that a rebuttable presumption of undue influence arises.

■ This rule is well stated in the *Estate of White*, 128 Cal.App.2d 659, where the court said commencing at page 668 [276 P.2d 11]: ''A presumption of undue influence arises from proof of a confidential relation between a beneficiary and a testator plus proof of activity on the part of the beneficiary in the preparation of the will. . . . In some cases . . . the rule is expressed that 'where one who unduly profits by a will sustains a confidential relationship to the testator and actively participates in procuring the execution of the will, the burden is upon him to show that the will was not induced by his undue influence.' Both of these expressions of the rule are essentially the same, although the first does not refer to 'one who unduly profits by a will.' There would be no need for such a presumption and it would serve no purpose where any supposed influence had accomplished nothing. The presumption is rebuttable. ■ When proof is made sufficient to give rise to the presumption, the burden is on the beneficiary to show that the will was not procured by his undue influence. Whether the presumption was overcome is a question for the trier of fact.'' (See *Estate of Harkleroad*, 62 Cal.App.2d 60, 64 [144 P.2d 88]; *Estate of Witt*, 198 Cal. 407, 419 [245 P. 197]; *Estate of Johnson*, 31 Cal.App.2d 251, 257 [87 P.2d

900]; see also *Estate of Cowhick,* 156 Cal.App.2d 635, 641 [320 P.2d 181].)

The instant case has a fact situation remarkably similar to that existing in *Estate of Chesney,* 102 Cal.App.2d 708 [228 P.2d 46], in which probate of the proponent will was denied. In that case the testatrix was old and the proponents of the will were neighbors who lived across the street and took care of her. She deeded her property to them and they agreed to take care of her for the rest of her life. She drew a will in their favor. Other neighbors testified that after the Bosworths had taken charge they were not allowed to speak to the testatrix. In affirming the order of the trial court denying probate to the will, the appellate court said at page 711: ''There is ample evidence in the record to substantiate the findings of the trial court that a confidential relationship existed between Mr. and Mrs. Bosworth and the decedent, that proponents were active in procuring the execution of the will and unduly profited thereby. Where such a confidential relationship is found to exist and the beneficiaries have been active in procuring the execution of the will to their undue advantage, a presumption of undue influence arises. (Citation.) In such a situation, the burden is cast upon the beneficiaries to overcome the presumption existing against them. This the trial court held they failed to do. This court is empowered only to determine whether there is substantial evidence in the record to support the findings. From the foregoing brief summary of the evidence it clearly appears that a confidential relationship existed, that the testatrix was physically incapacitated, and apparently completely dependent upon the services of others, and that the Bosworths were active in procuring the execution of the will under which they benefited exclusively. Mrs. Bosworth gave instructions to the attorney, was present when the will was executed and, so far as the record discloses, Mrs. Chesney received no independent advice concerning the disposition of her property. There was no showing that the attorney ever consulted personally or at all with the testatrix concerning the terms of the will.''

So it is in the case now before us. There is ample evidence of breach of confidence and undue influence on the part of the Beavers in securing, not only the execution of the will, but the other documents. In fact, there is some evidence that the power of attorney was obtained at an earlier date than that which it now bears and that the date was changed to coincide with the date of the notarization. The facts in the

instant case weigh more heavily of undue influence than do those in the Chesney case for the reason that here the decedent was actually being cared for in the home of appellants and was under their constant supervision, whereas in the Chesney case the persons found to have exercised the undue influence lived across the street, and in this case the documents were prepared by one of appellants, whereas in the Chesney case an attorney was obtained.

Appellants rely upon *Estate of Welch,* 43 Cal.2d 173, 175 [272 P.2d 512], where the Supreme Court reversed a jury verdict denying probate to a will and codicil on the ground of undue influence. Appellants point out that the court there held: ''Mere general influence, however strong and controlling, not brought to bear upon the testamentary act, is not enough; it must be influence used directly to procure the will and must amount to *coercion* destroying free agency on the part of the testator.'' (Emphasis that of the court.)

But *Estate of Welch, supra,* is not applicable to the facts in the instant case for the reason that there was in the Welch case no confidential relationship creating a presumption of undue influence as there is in the case before us. In Welch the proponent and beneficiary of the will and codicil was a brother of the decedent and the Supreme Court said, at page 178: ''Consanguinity of itself does not create a fiduciary relationship. (Citation.) Myrtle's mental and physical condition was not shown to have been such as to permit a subversion of her freedom of will or to negate her independent management of her own affairs. On the contrary, so far as appears from the record, Myrtle was at all times a clear thinking, deliberate woman, aware of her property holdings and financial situation, and it was not until a few days before her death that her general condition deteriorated.'' The codicil was executed by her almost two years after the will. In the Welch case the decedent was aged 68 when she made the will; in the instant case Miss Hall was 87 years old and there is some evidence that after she had signed the documents, she herself did not know for sure what she had signed.

In the case before us, because of the confidential relationship, the burden was upon appellants to overcome the presumption of undue influence. This they did not do to the satisfaction of the trial court and there is ample evidence to sustain his finding.

The order from which this appeal is taken is affirmed.

Fox, P. J., and Herndon, J., concurred.