[Civ. No. 3651. Third Appellate District.—January 9, 1929.]

CARRIE L. THORNLEY, as Executrix, etc., Appellant, v. LEWIS S. JONES et al., Respondents.

Arthur Goodrick for Appellant.

H. S. Clewett and Farrand & Slosson for Respondents.

FINCH, P. J.—The plaintiff, as executrix of the last will of Alfreda Smith, deceased, brought this action against the defendants to recover property alleged to belong to the estate of decedent and for an accounting thereof. The defendant Nelson was not served with summons and did not appear in the action. Judgment was entered in favor of the other defendants denying plaintiff any relief. She has appealed from the judgment.

In appellant's opening brief it is said: "Two important issues were litigated. 1. Did the defendants, or any of them, obtain any of the money or property of Alfreda Smith during her lifetime without consideration or through fraud or undue influence? 2. Did a conspiracy exist among the defendants, or any of them, to accomplish such purpose?"

The findings of the trial court are against the plaintiff on both of these issues. The evidence is fully sufficient to support the findings in favor of the defendants Kirby and California Mortgage Company. Jones testified that there was no agreement, understanding, or concert of action between him and Nelson in connection with the acquisition of the property in question. The credibility of this testimony was exclusively for the trial court. The only question left to be determined, the judgment not running against Nelson, is whether Jones obtained any of the property of Mrs. Smith without consideration or through fraud or undue influence.

The plaintiff is the daughter of Mrs. Smith, who was also known as Miss Smith. She came from Ohio to California in the year 1916 and thereafter resided in the plaintiff's home in Los Angeles until 1920, when she went to live with a family of the name of Bailey, none of the family being related to her. She left the Baileys in June, 1923, and for the next eighteen months lived with other strangers in blood named Davis. She returned to plaintiff's home November 15, 1924, and remained there until her death January 9, 1925.

It may be gathered from the evidence that Mrs. Smith owned no property until the year 1915, when there was distributed to her, from the estate of a deceased brother, property of the value of about $20,000. In 1916 she furnished the money with which to buy a home for the plaintiff. She loaned $900 to the plaintiff and $800 to Nelson. While living with the Baileys, Mrs. Smith advanced $1,500 to them for the purchase of a lot in Los Angeles. They applied the money so advanced in payment on the purchase price of the lot and, April 20, 1923, she commenced an action against them to establish her interest in the property purchased, Jones acting as her attorney. The case was not brought to trial during Mrs. Smith's lifetime, but after her death it was successfully prosecuted by another attorney, who recovered judgment in favor of her estate. December 28, 1923, Mrs. Smith, through Nelson, who was an agent of Kirby, engaged at the time in selling capital stock of the California Mortgage Company, purchased forty-eight shares of the preferred stock of that corporation and twelve shares of its common stock, in payment for which she delivered to the corporation $1,951.23 in cash, a certificate of deposit for $600, and a promissory note for $2,500, secured by a mortgage on real estate, both executed by Fred Hessler, March 13, 1923. The trial court found that "said stock was worth at the time she received it the price she paid for it." Certificates for all of the stock were issued to and in the name of Nelson. Three days later he surrendered the stock and caused two certificates for twenty-four shares each of preferred stock and one certificate for twelve shares common stock to be issued to Mrs. Smith. January 11, 1924, Mrs. Smith assigned half of the preferred stock and half of the common stock to Jones and the remainder thereof to Nelson. New certificates were thereupon issued to each of them for twenty-four shares of preferred stock and six shares of common stock. Both Jones and Nelson left the respective certificates so issued to them in custody of the corporation, with instructions to pay all accruing dividends on the stock to Mrs. Smith during her lifetime. Within a few days after her death they transferred the stock to persons who are not parties to this action. The court found:

"Alfreda Smith . . . during the year 1923 was of the age of about 80 years; she was of a trusting and confiding

disposition and for several years prior to her death was gradually but not noticeably in failing health due to her advanced age, and her vision and hearing were impaired during the several years immediately prior to her death; she had some knowledge and experience in business transactions but such knowledge and experience were very limited, and due to her failing health and impaired senses and her disposition she was, during the years 1923 and 1924, likely to be influenced or deceived or imposed upon by designing persons.

''From and about the year 1920 to a time shortly prior to the death of said decedent, defendant Jones acted as her attorney. . . . On or about January 11, 1924, the said Alfreda Smith voluntarily transferred and assigned to the the said defendant Jones 24 shares of said preferred and 6 shares of said common capital stock, and a like amount to the said defendant Albert O. Nelson.

''The defendants Jones, Kirby and the California Mortgage Company did not nor did any of them ever make any false or untrue representations to the said Alfreda Smith.''

The court did not find whether the transaction between Jones and his client, by which she gave him property of the value of $2,500 in payment for his professional services, was fair and equitable, or whether she was informed of all matters relative to the transaction so as to enable her to act understandingly. Jones knew of her inexperience in business transactions, because in the complaint drafted by him in her action against the Baileys, after the allegation that she had furnished the sum of $1,500 which was used by the defendants in the purchase of the lot hereinbefore mentioned, with the understanding that she was to have a corresponding interest in the lot, it is alleged:

''That this plaintiff is over eighty years of age, and . . . at all times placed great confidence and trust in the defendants, and relied solely upon them to look after her interests, she having no knowledge of business transactions or making of deeds, mortgages or other title papers, and believed that the same was all properly attended to and taken care of for her by the defendants. That . . . the defendants made and delivered to this plaintiff a promissory note in the principal sum of $1,800, which they stated to this plaintiff secured and represented her interest and ownership in said

real property, and this plaintiff believed that the same gave her an interest in the title to said property as a part owner thereof."

Relative to his services for Mrs. Smith, commencing in September, 1920, Jones, as a witness in his own behalf, testified as follows:

"I was called out there to her residence in Hollywood to prepare a will for her. . . . She was ill at the time and perhaps it was two or three weeks after that before I saw her, and she came down to my office. . . . I saw her at least twice a week during my acquaintance with her. . . . She usually came around in the morning; she was usually at the office when I arrived. . . . She would spend from half to three-quarters of an hour, sometimes perhaps an hour. . . . Outside of discussing her eastern affairs, from time to time, most of it concerned her relations and transactions with Mrs. Thornley. . . . She told me that she had bought that property, bought the Thornley home, I believe she stated that she had paid off the mortgage on it, . . . I think four or five thousand dollars. . . . And she said that she had let them have money from time to time, she had bought, paid for, I believe, a camera for Mr. Thornley. He was either a photographer or motion picture cameraman. . . . And likewise she had paid off some furniture that was in the house and sort of complaining about the amount of money she had paid and now was going to be deprived of a home. . . . I had a note signed by Mrs. Thornley for $900 that I had in my possession for quite sometime. And Miss Smith had requested several times that I bring suit on the note and I told her that I didn't see that there was very much use of bringing suit as long as what she had told me was true, that they did not have anything except this place they lived in. . . . Several times throughout her transactions she had told me that she had mortgages and notes in the east which were in the possession of her attorney, Mr. Barton Griffith. . . . And she discussed several times about selling those mortgages and investing the money here . . . but nothing was ever done about it. I didn't tell her to do it or tell her not to do it. I let her use her own judgment on that, until she requested me to send for these securities. . . . The only money that she ever paid me was $10 that she paid me for drawing this first will. . . . I said to her one day, . . . perhaps a couple of months after I had met her, 'What about com-

pensation or paying me? . . . It is rather difficult to make a definite charge. . . . You come in here and you are here a half an hour or three-quarters of an hour. . . . You come back time and again. . . . What do you think about it?' She said, 'Well, you know that I only have about $70 or $75 a month coming from my investments. . . . Some day it will be different, and . . . you will never lose anything by taking care of my business. . . . I will compensate you when my affairs are put in such a condition that I can. I will dispose of some of that property or make a change in it, then I will compensate you for all you have done; and try and remember the best you can what you do for me, as I know I come down here a lot of times when really there is no reason, but . . . I feel much better when I come down and discuss these different matters with you.' . . . I didn't make any entry or any charge for the time that I put in for her, because that would be a regular occurrence that . . . I could always bet that I would see Mrs. Smith once or twice a week, . . . A great many times . . . she would volunteer the information, . . . it got to be quite a common occurrence; she said, 'You will never lose anything by taking care of my business.' . . . Q. When was the first time you ever knew Miss Smith owned any stock in the California Mortgage Company? A. When she came into my office on January 11, 1924, and brought the stock certificate. . . . Q. Prior to that time had you ever heard of the Hessler mortgage? A. I had never heard of it. The first I heard of that was when this suit was filed. Q. Who was present when Miss Smith brought those certificates of stock into your office? A. Just myself, Miss Smith and Mr. Rifkind came in . . . She came in on the usual morning trip. . . . She said, 'Well, Mr. Jones, I told you a great many times that you would not lose anything by taking care of my business for me. . . . I have some stock in the California Mortgage Company, and I am going to have it divided between you and Mr. Nelson. . . . You have worked these number of years for me and I have not paid you anything for your services, and I am getting old, I won't have use for it much longer, and Mr. Nelson has been very kind to me, and I am going to divide it between you.' Well, I was a little surprised at Nelson getting any, I didn't quite understand it, but I was not the judge of it. . . . I said, 'According to what you have

told me you only have about $70 or $75 a month income. . . . I will be willing, and I want to do this, that as long as you live that you will draw the interests or dividends . . . of this stock.' . . . So I filled mine in. . . . I called Mr. Rifkind in. . . . He said, 'You are signing this, Miss Smith, transferring this stock to Mr. Jones, are you, and Mr. Nelson?' She said, 'Yes.' So he signed it as a witness and I gave the stock back to her and she said she would take it over to the Mortgage Company. . . . I have a rule that if anyone comes in for a half an hour to an hour, we will say, just a consultation, I make a charge of $5. . . . The wills were very brief. I will say they were worth not to exceed $25 apiece. As a matter of fact, I only charged $10 on the first one. Q. What do you consider was the reasonable value of your services that you rendered in the Bailey case? . . . A. I would say at least $150. . . . I collected a hundred dollars for Miss Smith from Mr. Dietrich. . . . Q. She did not really counsel or advise with you in regard to the loans she was making, did she? A. It is apparent that she did not. . . . Q. What was all of this talk twice a week, half an hour, in regard to this old lady about? A. Well, about half of it was concerning Mrs. Thornley. . . . No, not half of it, maybe. Mrs. Thornley half, and I think even about her matters in the east, and she has related to me many, many times about the farm that was sold back there, and about it being subdivided, a mortgage that she held, and one of these mortgages, she said that they were subdividing the farm, and if she had held onto it, it would have been worth a lot more money, something to that effect, and she would discuss those things from time to time; it wasn't so much business on every occasion but the old lady would come in and she would want to talk to me, want to sit down and discuss this and that and the other, and I gave her the time. Q. Really it was just more of a social call than anything else? A. Sometimes, from my viewpoint, I would say it was, but I didn't have the time to spend as a rule, yet she seemed to want to take my time, and as long as she had stated that I would never lose anything by taking care of her affairs and giving my time, why, I thought it was my duty to give it to her."

Mrs. Smith was the owner of securities, consisting of promissory notes and certificates of deposit in building

and loan associations, of the value of about $6,000, which were in the possession of her attorney, Barton Griffith of Columbus, Ohio. August 29, 1924, she signed a letter prepared by Jones, requesting Griffith to send these securities to her in care of Jones. Griffith complied with the request, and upon receipt of the securities, Mrs. Smith left them in the custody of Jones. She had an attack of illness in November, 1924, and on the 15th of that month the plaintiff took her to the plaintiff's home. December 4, 1924, Mrs. Smith employed Arthur L. Goodrick, one of the attorneys for the plaintiff in this action, and gave him her general power of attorney. Goodrick made demand upon Jones for Mrs. Smith's securities, whereupon Jones and Nelson called upon her and she personally directed Jones to deliver the securities to Goodrick. Instead of complying with such direction, Jones, as attorney for Nelson, filed a petition for the appointment of a guardian for Mrs. Smith, alleging that "up until approximately six weeks prior to the filing of this petition, the said Alfreda Smith has been in good health and has been capable of and did attend to her business affairs; that on or about six weeks prior hereto, the said Alfreda Smith suffered a severe attack of illness accompanied by a stroke of paralysis, and that since said illness the said Alfreda Smith . . . is incapable and incapacitated from attending to or caring for her property." In the petition the Title Insurance and Trust Company was suggested as guardian. Goodrick appeared at the hearing, as attorney for Mrs. Smith, and, by stipulation, the Citizens Trust and Savings Bank was appointed her guardian. Jones delivered the securities in his possession which he had received from Griffith to the guardian.

August 23, 1924, Mrs. Smith loaned Nelson the sum of $800 hereinbefore mentioned. Since the action, as against him, has not been tried, it is unnecessary to state the facts relating to his conduct with particularity.

The foregoing lengthy statement of facts is set forth for the purpose of accurately presenting the issue to be decided. It appears from the testimony of defendant Jones that Mrs. Smith gave him capital stock of the California Mortgage Company of the value of about $2,500 in payment for his services as her attorney, no agreement as to the amount of his compensation having heretofore been made.

■ "An attorney may make an enforceable contract with one about to become his client for the payment of compensation for services to be rendered, and such a contract is not subject to the particular scrutiny of the court." (6 C. J. 735; 3 Cal. Jur. 626; *Cooley* v. *Miller & Lux*, 156 Cal. 510, 524 [105 Pac. 981].) ■ "A contract between an attorney and client for the former's compensation, entered into during the existence of the relation, is not void, although presumptively invalid, the burden of showing fairness resting on the attorney." (6 C. J. 735; *Reynolds* v. *Sorosis Fruit Co.*, 133 Cal. 625, 630 [66 Pac. 621].) "All dealings between an attorney and his client for the benefit of the former are not only closely scrutinized, but are presumptively invalid on the ground of constructive fraud and such presumption can be overcome only by the clearest and most satisfactory evidence. Not only must the attorney offer clear and satisfactory evidence that the transaction between himself and his client was fair and equitable and no advantage was taken by him, but he must also offer proof that the client was fully informed of all matters relative to the transaction and was so placed as to be able to act understandingly and to deal with the attorney at arm's-length." (*Estate of Witt*, 198 Cal. 407, 419 [245 Pac. 197, 202]; *Magee* v. *Brenneman*, 188 Cal. 562, 567 [206 Pac. 37].)

■ There are cases, of course, where the knowledge and experience of the client are such as to overcome the presumption referred to, but the facts of this case are such as to require the strict application of the foregoing rule. Mrs. Smith was over eighty years of age, and, as the court found, "of a trusting and confiding disposition, . . . in failing health due to her advanced age; . . . her vision and hearing were impaired"; her business experience was "very limited"; she was "likely to be influenced or deceived or imposed upon by designing persons." She was induced to believe that the Bailey promissory note gave her an interest in real estate purchased by them. When she loaned Nelson $800, August 23, 1924, and took his promissory note therefor, he delivered to her a deed from Elsie Meridith to himself for certain lots and induced her to believe that the instrument was a mortgage securing the note.

Jones' testimony shows that the value of the stock received from Mrs. Smith was out of all proportion to the professional

services rendered by him. In announcing his decision, the trial judge said: "I find from the evidence that this old lady for some reason or other went to this office two or three times a week for four years practically. Now, I don't know what she went there for. She had some little business interest—not so much. But here is an old lady, 82 years old, that wanted to talk to somebody. She could not talk to her own daughter. She found Mr. Jones here a man that she could talk to at least, and maybe get some advice and some consolation and satisfaction. And I don't know but what even for that service he is entitled to something." Jones testified that the reasonable value of his services in the Bailey suit was $150. He drew three short wills for which he said his services were worth not to exceed $25 each, and for the first one he charged and was paid $10. He collected $100 for Mrs. Smith. He advised her of the futility of suing Mrs. Thornley on her promissory note. Several months after the stock was assigned to him he caused Mrs. Smith's securities to be transferred from Griffith's custody to his own and, for a few months thereafter, he held possession of them. He states that about half of Mrs. Smith's consultations with him were in relation to Mrs. Thornley, but he does not say that there was any intention or thought of attempting to recover anything from her, except on the nine hundred dollar note. She loaned $2,500 to Hessler, purchased stock for over $5,000, and loaned Nelson $800, apparently constituting all of her principal business transactions during the time that Jones was her attorney, without consulting him. The services for which he claims he was compensated by the transfer of the stock are, in the main, too indefinite and intangible to justify any inference as to the value thereof, and the court made no finding as to the value of such services. It certainly would be out of harmony with professional ethics for an attorney, dealing with a client such as Mrs. Smith, to charge a professional fee for her social visits or for innumerable consultations to determine whether to bring suit on a nine hundred dollar note against a person having no property subject to execution. It cannot be held that "the client was fully informed of all matters relative to the transaction and was so placed as to be able to act understandingly and to deal with the attorney at arm's-length," when the attorney did not inform his

client that the compensation she was tendering him was several times the amount his professional services were worth and several times the amount usually charged for similar services. He must have known that Mrs. Smith was in her second childhood, but he did not suggest to her the improvidence of parting with property of the value of $5,000, leaving her with no other property in excess of $6,000 in value, except the uncertain amount she might recover from the Baileys. Jones testified that he never asked Mrs. Smith "to turn over any property" to him and never made any suggestion to her that she do so, and the court found that he never made "any false or untrue representations to the said Alfreda Smith." But, in a case such as this, proof of mere negative conduct on the part of an attorney dealing with his client is not sufficient "to overcome the presumption of fraud and unfair dealing which is automatically raised by the law as a protection to a client." (*Estate of Witt, supra.*) The attorney must go further and show that his client was given the information which, under similar circumstances, a disinterested legal adviser would have given.

In announcing his decision the trial judge said: "I don't know why this mother and daughter did not live together happily and did not know each other's business and each other's pleasures, but they did not." This statement, however, even if it had been made as a finding, would be wholly immaterial as bearing upon the reasonableness of the compensation given Jones for his services.

The trial judge also said: "I am convinced from the testimony here that this man Nelson had an unnatural and unusual influence over this old lady for some reason. . . . In my opinion, she was influenced by Nelson." This was not said, however, in relation to the transfer of the stock to Jones, and the court's finding that there was no conspiracy between Jones and Nelson has sufficient support in the evidence and, therefore, must be accepted as true.

The judgment in favor of the defendants Kirby and California Mortgage Company is affirmed, and the judgment against the plaintiff in favor of the defendant Jones is reversed.

Shields, J., *pro tem.,* and Plummer, J., concurred.